SHEPHERD, J.
 

 Appellant, Daniel Gilbert Andrew Chin, appeals the denial of his motion for a new trial from a jury verdict in the sum of $1,360,740, awarded to Plaintiff/Appellee, William Roger Caiaffa, for injuries to his right knee, right ankle, right testicle, and right wrist, arising out of a collision between Chin’s automobile and Caiaffa’s motorcycle. As in
 
 SDG Dadeland Associates, Inc. v. Anthony,
 
 979 So.2d 997 (Fla. 3d DCA 2008), we again reverse a verdict obtained by the same plaintiffs counsel, Ronald M. Simon, Esq., and for the same reasons, “an improper attack on [the defendant] ... and its defense counsel.”
 
 Id.
 
 at 999.
 

 As in
 
 SDG Dadeland,
 
 the improper litigation tactics engaged in by counsel for Caiaffa began in the opening statement and ended with rebuttal closing. They included the following:
 

 1. Improper appeal to the passion and sympathy of the jury in opening statement.
 

 2. Improperly convincing the trial judge to limit defense counsel’s cross-examination of Caiaffa’s expert, Dr. Wender.
 

 3. Improper character attack during cross-examination of main defense expert, Dr. Umlas.
 

 4. Improper and prejudicial closing argument.
 

 THE OPENING STATEMENT
 

 Moments into his opening statement, after having been admonished three times in voir dire for pre-trying his case, Mr. Simon drew an objection, which was overruled, that his opening comments constituted closing argument when he told the jury:
 

 The dramatics of this, folks, to try to think about and embrace — and this is going to be hard for you in this case— the evidence will be that [Caiaffa’s] going to live for over 50 years with half his manhood missing and with pain from that. And we only in our common sense, life’s experience can imagine how that —
 
 [1]
 

 Tr. vol. IV, p. 298, 1. 14-21. Moments later, another objection was raised after Mr. Simon stated:
 

 
 *304
 
 Because they [Chin] admitted they’ve caused this accident and caused the injuries. But he’s [Caiaffa] still sitting here in debt over $80,000 in medical expenses.
 

 Tr. vol. IV, p. BOB, 1. 2-5. This objection, however, also was overruled. Tr. vol. IV, p. 303, 1. 9. Almost immediately thereafter, the following statement was made by Mr. Simon, “By their [Chin’s] negligence they wrote a blank check. It’s your job to fill it.” Tr. vol. IV, p. 304, 1. 20-21. That comment was then followed by this one:
 

 I think when you hear from Dr. Um-las and you hear from Mr. Koenigsberg and when you hear from Dr. Mekras or all the doctors that Mr. Adams [defense counsel] has retained, you will find out that they’re all retained for a particular reason.
 

 Tr. vol. IV, p.
 
 306,
 
 1. 21-25. The purpose of this comment, specifically the allusion to a “particular reason” the defense doctors were retained, did not become clear until Mr. Simon’s closing argument.
 
 See infra
 
 pp. 304-05.
 

 After defense counsel’s opening statement concluded, the following colloquy was held outside the presence of the jury:
 

 THE COURT: I didn’t understand your objection. Why are you objecting to him talking about medical bills?
 

 MR. BACA [co-defense counsel]: Well, he says he’s in debt $80,000. But first of all, that’s not correct. He’s got health insurance that paid Dr. Ceballos’ bill and Health South.
 

 MR. SIMON: The bills are [$]125,000; with the insurance, they’re down to [$]82[,000] which is—
 

 MR. ADAMS: It’s inappropriate in opening statement to tell the jury that somebody is in debt. Because ... number one, it’s argumentative; and number two, it implies the lack of ability to get these things paid for if your insurance paid for them or will pay for them. You’re not lacking them because of finances.
 

 Tr. vol. IV, p. 317,1. 8-24.
 

 THE CLOSING ARGUMENT
 

 Caiaffa’s entire case was framed by these comments in opening statement, and then the following in Caiaffa’s initial and rebuttal closing argument: “Does that sound like a compassionate, caring, admitted negligent defendant? In two and a half years we haven’t heard ‘I’m sorry I caused the accident.’ ” Tr. vol. IX, p. 917, 1. 1-4. An objection was sustained. Tr. vol. IX, p. 917,1. 7. Then, plaintiffs counsel made the following argument:
 

 It’s difficult to comprehend in many ways because we can’t feel his pain. We can only guess, only imagine. We seem to accept other people’s pains and problems and disability, because that’s how we have to live.
 

 That old expression “Scars are only tiny on somebody else’s face.” So I’ve said embrace him [Caiaffa] for the time you’re here so that you can do justice.
 

 The defendant wrote a blank check.
 

 Tr. vol. IX, p. 925, 1. 8-17 (emphasis added).
 

 Finally, in closing rebuttal argument— when there was no opportunity for reply— Mr. Simon clarified for the jury what he meant when he told them, in opening statement, there was a “particular reason” defense experts were hired:
 

 ... I finally learned the theme of the defense. And as I was suspecting [the defense was that], we used medical records here and there to try to fool you, to try to create a theme that at the end of the day that instead of taking responsibility for something that they did that was wrong, something they did that left somebody wrong, they’ve gotten up here
 
 *305
 
 and, basically, said either I have something to do with the first surgeries and injuries, the doctors have something to do with the further surgery or injuries or Willie [Caiaffa] is a liar.
 

 So instead of taking responsibility for what they have done wrong and for everything that’s happened to him, what they’ve done is they’ve added insult to injury.
 

 You know we’re forgiving in this country; and we should be. We’re compassionate forgiving people. People make mistakes. We all make mistakes. But
 

 you make a bigger one when you don’t admit it; and you make a bigger one to try to avoid responsibility. And you make a bigger one when you call in witnesses that don’t tell the truth. Anything to win. Anything to save the day.
 

 They’ve done wrong; they haven’t done right. I’ll give you, because this is rebuttal, a little bit of evidence about how that’s a theme and a theory, not a fact.
 

 We’re all sorry this accident happened, not that they were. He [Mr. Adams] tells you that there is a very interesting theme going on here. There is the actual problem[ ] and then there is lawyer-driven lawsuits. And if there was ever evidence of lawyer-driven— MR. ADAMS; Excuse me, Your Honor. Can you sustain that objection?
 

 [[Image here]]
 

 COURT: Yes.
 

 Tr. vol. IX, p. 960,1. 9-18; p. 961,1. 19-20, 24 (emphasis added).
 

 Those comments were followed by this argument:
 

 If you believe [Caiaffa] is a liar, if you believe [Caiaffa] is faking those things, if you look at all of the evidence, that’s your problem.
 

 But if on the other hand, you think the defense was frivolous and not the plaintiff[’]s, then your verdict should be the same whether their defense was frivolous or not. It should be what’s fair, reasonable, adequate and just to compensate a young man who didn’t want to be here. He didn’t volunteer to be here. He didn’t volunteer to have this life. Folks, only in a courtroom, only in a courtroom is the value of human life cheap. As I submit to you, if Mr. Chin ran into Mr. Adams’ car that had a beautiful magnificent Picasso painting worth $10 million and it got ripped from that accident or it got shredded from that accident, he’d [Mr. Adams] tell you to go back there and not take your time.
 

 MR. ADAMS: This is not a fair comment. It’s certainly not rebuttal.
 

 COURT: Sustained.
 

 Tr. vol. IX, p. 968,1. 18-25; p. 969,1. 1-15 (emphasis added). Despite a sustained objection, Mr. Simon persisted:
 

 When you consider the value of this claim, if there were a Picasso, ladies and gentlemen, that was torn by a result of an impact between a car and another car and the value of the painting was worth $10 million dollars in this case and it wasn’t [Caiaffa], it was Picasso’s painting, you would go back and in five minutes you would write out a $10 million check.
 

 Now, I submit to you, this son, this brother, this hard-working family member of our community is worth a lot more than any piece of property. And whatever you-all believe is fair and reasonable is going to suit [Caiaffa] just fíne, because he’s going to do everything no matter what happens here, to become the man he once was, even though he feels he’s half a man right now. If there’s anybody that can overcome any
 
 *306
 
 thing including an unjust verdict, it would be [Caiaffa], I ask that you consider that. To do less than full justice as you’ve taken an oath to, would be doing another injustice to [Caiaffa], who didn’t volunteer to be here. He can’t buy somebody else to carry his pain.
 

 Tr. vol. IX, p. 969, 1. 16; p. 970, 1. 14 (emphasis added).
 

 THE TRIAL
 

 Viewed within the contextual framework of Mr. Simon’s opening statement and closing argument was the evidence introduced by Mr. Caiaffa. The testimony of Dr. Wender was presented first. Dr. Wender, an orthopedic surgeon, initially saw Caiaffa six months after the accident, on October 18, 2005, for a second opinion on the injury to the right knee. This was after Dr. Cesar Ceballos, Caiaffa’s first orthopedic physician, had performed successful reconstructive surgery on the knee. Dr. Wender’s own records reflect that he was furnishing a “second opinion,” and that Caiaffa’s initial appointment was scheduled pursuant to discussions between Mr. Simon’s office and Dr. Wender’s office while Caiaffa was still under the care of Dr. Ceballos.
 
 [2]
 
 Defense counsel sought to elicit this fact on cross-examination. Notwithstanding the contents of Dr. Wender’s records, Mr. Simon’s objection to the proposed cross-examination was sustained.
 

 Mr. Simon further sought to shield Dr. Wender’s testimony from scrutiny when the defense’s rebuttal orthopedic surgeon, Dr. Umlas, was called to testify. Although Dr. Umlas had never been called for deposition by Mr. Simon — because, as Mr. Simon advised the trial court, he already knew what Dr. Umlas was going to say, Tr. vol. VIII, p. 732,1. 10-15 — Dr. Umlas had provided plaintiffs counsel with two reports containing the opinions he expected to render in the case. The second report was prepared in November 2006. The reports made clear Dr. Umlas’ opinion that Dr. Ceballos’ surgery was a success, Caiaffa’s knee “resolved,” and that Caiaffa was, therefore, not a candidate for additional knee surgery. At the same time, Caiaffa continued under Dr. Wender’s care right up to (and including) trial, and Caiaf-fa’s counsel periodically sent updated medical reports to defense counsel, who duly forwarded them to Dr. Umlas. During this period, Dr. Wender performed additional knee surgery on Caiaffa, a fact, no doubt, duly noted in one of these reports.
 
 [3]
 
 Defense counsel received the last such report one business day before trial, and, on the following Tuesday, the day before Dr. Umlas testified, provided a supplemental report from Dr. Umlas. Despite his confidence in his ability to cross-examine Dr. Umlas without a pre-trial deposition (and while declining a peace offering from the court to recess the trial for the taking of a deposition), Mr. Simon argued that Dr. Umlas should be prohibited from addressing any care or surgery subsequent to the date of Dr. Umlas’ second report. Defense counsel countered:
 

 The report that he has generated does not in any way change his opinion. [Dr. Umlas] had an opinion as far back as November of 2006 that this man was ... not a candidate for additional knee surgery, that his knee was fine and resolved and that he had gotten a good result from Dr. Ceballos’ initial ACL
 
 *307
 
 repair. That’s the opinion he’s going to give today.
 

 His report indicates that he has seen what was done. He disagrees that there are findings and things that were done by Dr. Wender that were a result of this car accident or trauma from the car accident and that’s what he said. It’s consistent exactly with what he’s done.
 

 Tr. vol. VIII, p. 712, 1. 10-25 (emphasis added). The trial judge nevertheless acceded to Mr. Simon’s plea.
 

 Finally, Mr. Simon personally accosted Dr. Umlas at the outset of cross-examination by announcing that Dr. Umlas was the only orthopedic expert retained by defense counsel’s law firm, when Mr. Simon knew from experience with the firm that it was not true. Tr. vol. VTII, pp. 781-82; 784-85. Mr. Simon then followed by reading to the jury selections from a jury verdict reporter listing Dr. Umlas as an expert, expounding on the facts and circumstances of those other cases, to suggest Dr. Umlas always disagrees with the treating doctor and never testifies that a plaintiff is injured. Defense objections to the former line of inquiry, initially overruled, were finally recognized, but the appellant here argues the damage was done. As to the latter, Mr. Simon’s promise in a side bar colloquy to cabin the use of the jury verdict reports was but intermittently honored.
 

 ANALYSIS
 

 This is a meritorious case. Chin’s car collided with Caiaffa’s motorcycle. Chin caused the accident and admitted he was responsible for it. The case was tried on damages only. Unfortunately, plaintiffs counsel engaged in litigation tactics, which, taken individually and in combination, indisputably require reversal.
 

 It long has been understood that the function of an opening statement is “briefly to outl[]ine what the party expects to prove in support of his cause of action or defense.”
 
 Juhasz v. Barton,
 
 146 Fla. 484, 1 So.2d 476, 478 (1941) (quoting An Automobile Accident Suit (Anderson), 276). As Judge Sawaya
 
 [4]
 
 recently has written:
 

 [A] properly presented [ ] opening statement familiarize[s] the jury with the evidence, thp nature of the case, and each party’s theory of recovery and defense. It allows jurors to better understand the evidence as it is introduced and to more accurately discern its force, effect, and weight.
 

 6
 
 Fla. Prac., Personal Injury & Wrongful Death Actions
 
 § 24:3 (2008-09 ed.). Conversely, counsel both legally and ethically is prohibited from telling the jury he will prove something he cannot prove or that is doubtful.
 
 See
 
 Trawick,
 
 Fla. Prac. & Proc.
 
 § 22.6 (2010 ed.). This watchful eye cast over opening statements appears to have its origin in a long-standing concern, expressed by the Florida Supreme Court more than fifty years ago as it began to untether counsel from a mere reading of the pleadings as opening statements:
 

 It may well be that any unscrupulous attorney (if there be such) or one who must choose between suffering the pangs of conscience because of an infraction of the canons of professional ethics, and suffering the pangs of hunger, the realization of his family being in want, and the hounding of creditors may yield to the temptation to overstep the bounds of propriety where one who by fortuitous circumstances is faced with no such problem may experience no such temptation.
 

 Juhasz,
 
 1 So.2d at 478. There is no indication in the many Florida Supreme Court
 
 *308
 
 opinions issued in civil cases since that time that its concern is any less today.
 

 Counsel for Caiaffa failed to follow the rules pertaining to the giving of an opening statement. His assertion, moments into the opening statement, that Caiaffa was going to “be living for over 50 years with half his manhood missing,” Tr. vol. IV, p. 298, 1. 17-18, is not supported by the evidence. Caiaffa’s right testicle was injured in the accident. It was not destroyed and has not been surgically removed. Although Caiaffa claims that sexual activity is painful, Caiaffa’s own urologist testified he is 100% fertile. It was improper for counsel to intimate Caiaffa was missing a testicle.
 
 See Juhasz,
 
 1 So.2d at 479;
 
 Trawick, supra.
 

 Moments after making this remark, counsel told the jury, “[Caiaffa’s] still sitting here in debt [with] over $80,000 in medical expenses.” Tr. vol. IV, p. 303,1. 4-5 (emphasis added). As experienced trial counsel well know, the general rule in Florida — especially applicable in a garden variety personal injury trial such as here — is that no reference may be made to the wealth or poverty of a party during the course of the trial.
 
 Samuels v. Torres,
 
 29 So.3d 1193, 1196 (Fla. 5th DCA 2010) (citing cases) (“Interjection of the wealth or poverty of any party has been consistently held by the courts to be irrelevant to the issue of compensatory damages in a personal injury case based on negligence. ...”). This Court and the courts of this state long have recognized the danger inherent in such commentary,
 
 see Carnival Corp. v. Pajares,
 
 972 So.2d 973, 977 (Fla. 3d DCA 2007), and often have held it to constitute reversible error.
 
 Batlemento v. Dove Fountain, Inc.,
 
 593 So.2d 234, 241 n. 15 (Fla. 5th DCA 1991) (citing cases) (ordering new trial where plaintiff adduced inadmissible evidence of plaintiffs’ impoverishment as a result of acts of defendants);
 
 see also Hollenbeck v. Hooks,
 
 993 So.2d 50, 50 (Fla. 1st DCA 2008) (reversing denial of plaintiffs motion for mistrial where defense counsel advised voir dire panel, “I’m a consumer justice attorney, and I represent John Hooks, a Merchant Marine, not some fancy company, not some conglomerate”);
 
 Pajares,
 
 972 So.2d at 977 (ordering a new trial where plaintiffs counsel’s allusion to cruise line’s resources was not relevant to action);
 
 State Farm Mut. Auto. Ins. Co. v. Revuelta,
 
 901 So.2d 377, 379 (Fla. 3d DCA 2005) (ordering new trial after counsel for plaintiff asked the jury to “call State Farm to account for failing to pay benefits” after receiving premiums from plaintiff insured for twenty years).
 

 Finally, in this context, counsel’s assertion in opening statement that, “By their negligence, they wrote a blank check,” Tr. vol. IV, p. 304, 1. 20-21 — compounded by repetition in final argument for jurors who might have been slow on the uptake — constituted an early appeal to sympathy, as well as an entreaty so often condemned by the courts of this state as to need no citation, that jurors may not be asked to award damages in accordance with the standard of what they themselves would want, and finally contrary to the rule of law on which the nation rests.
 
 Hollenbeck,
 
 993 So.2d at 51.
 

 Plaintiffs counsel’s closing argument was equally flawed. Unlike an opening statement, a final argument may be possessed of partisan zeal, with the signal caveat that the zeal must be confined to the evidence in the case and to the issues and inferences that can be drawn therefrom.
 
 See Murphy v. Int’l Robotic Sys., Inc.,
 
 766 So.2d 1010, 1021 (Fla.2000) (“Courts are conscious of the fact that without partisan zeal for the cause of [his] client, counsel in many instances could have little success in properly representing
 
 *309
 
 litigants in sharply contested cases, but his conduct during the cause must always be so guarded that it will not impair or thwart the orderly processes of a fair consideration and determination of the cause by the jury.”). The “broad latitude” often said to be possessed by counsel in closings is fully cabined by this legal requirement.
 
 See, e.g., SDG Dadeland,
 
 979 So.2d at 1002-03 (discussing application of the limit to the facts of that case).
 

 Mr. Simon’s closing violated this maxim and many of its corollaries as well. He told the jury that Chin, despite admitting liability, was not contrite and never apologized for the accident. An objection to this argument was sustained. He then implored the jury that “we can’t feel [Caiaffa’s] pain,” to “guess, only imagine” Caiaffa’s pain. Tr. vol. IX, p. 925, 1. 9-10. Mr. Simon highlighted the phrase that “[s]cars are only tiny on somebody else’s face,” Tr. vol. IX, p. 925, 1. 13-14, and finally told the jury for a second time that by admitting liability, “[t]he defendant wrote a blank check.” Tr. vol. IX, p. 925, 1. 17. The only conceivable purpose behind any of these arguments was to suggest the jurors place themselves in the claimant’s shoes in this case and thwart a fair consideration of the cause.
 
 See SDG Dadeland,
 
 979 So.2d at 1003-04 (discussing violation of the Golden Rule).
 

 Mr. Simon’s rebuttal closing argument was of the same mold. As in
 
 SDG Dadeland,
 
 Mr. Simon’s rebuttal closing argument in this case included an attack on the character of every person associated with the defense, including defense counsel.
 
 See SDG Dadeland,
 
 979 So.2d at 1003-04. As in
 
 SDG Dadeland,
 
 Mr. Simon painted the entire defense as “frivolous”— designed to “add[] insult to injury.” Tr. vol. IX, pp. 960-61, 1. 24. He accused defense counsel of “try[ing] to fool you.” Tr. vol. IX, p. 960, 1. 11-12. Then in an argument taken almost verbatim from his closing argument in
 
 SDG Dadeland,
 
 979 So.2d at 1000, he argued:
 

 We all make mistakes. But you make a bigger one when you don’t admit it; and you make a bigger one to try to avoid responsibility. And you make a bigger one when you call in witnesses that don’t tell the truth. Anything to win. Anything to save the day.
 
 [5]
 

 Tr. vol. IX, p. 961, 1. 2-8. These attacks are as much reversible here as they were in
 
 SDG Dadeland. See also Sanchez v. Nerys,
 
 954 So.2d 630, 632 (Fla. 3d DCA 2007) (argument that defense counsel was “ ‘pulling a fast one,’ ‘hiding something,’ and ‘trying to pull something,’ was tantamount to calling defense counsel liars and accusing them of perpetrating a fraud upon the court and jury,” requiring a new trial).
 

 Finally, instead of the “Puppy Story,” used to inflame the jury in
 
 SDG Dadeland,
 
 979 So.2d at 1000-01, here, Mr. Simon instead asked the jury to compare Caiaffa’s life to a Picasso painting valued at $10 million, and suggested that if this case had been about a $10 million painting, the jury “would go back and in five minutes you would write out a $10 million check.” Tr. vol. IX, p. 969,1. 22-23. Even a sustained objection did not halt Mr. Simon from continuing this line of argument. As we found in
 
 SDG Dadeland,
 
 979 So.2d at 1003, this argument was highly improper and grounds for reversal.
 
 Cf. Pajares,
 
 972 So.2d at 979 (finding a Van Gogh
 
 *310
 
 comparison to be “highly improper” but not fundamental error);
 
 see also Dufour v. State,
 
 905 So.2d 42, 64 (Fla.2005);
 
 Pub. Health Trust of Dade County v. Geter,
 
 613 So.2d 126, 127 (Fla. 3d DCA 1993).
 

 Lastly, of course, there was reversible error in the trial of this case. It is perfectly permissible to impeach the credibility of a medical witness with statements from the doctor’s own records, including that he was referred by counsel.
 
 See Morgan, Colling & Gilbert, P.A. v. Pope,
 
 798 So.2d 1, 3 (Fla. 2d DCA 2001);
 
 Flores v. Miami-Dade County,
 
 787 So.2d 955, 958 (Fla. 3d DCA 2001). The trial court erred in not allowing this evidence of bias to be brought to the attention of the jury on cross-examination of the plaintiffs urological expert, Dr. Wender.
 
 [6]
 
 The harm to the defendant in this case was further exacerbated when the lower court limited the testimony of Dr. Umlas. The exclusion of trial testimony by an expert is governed by the standard of prejudice in
 
 Binger v. King Pest Control,
 
 401 So.2d 1310 (Fla.1981). Prejudice in this sense refers to the surprise in fact of the objecting party, not the adverse nature of the testimony.
 
 Id.
 
 at 1314. In this case, Caiaffa was under the care of Dr. Wender until (and including) the time of trial. Dr. Umlas was long of the opinion that the single surgery performed by Dr. Ce-ballos was the only medically necessary surgery for Caiaffa’s knee injury. After Dr. Umlas submitted his last report, Dr. Wender performed additional surgery a few months prior to the trial. Although counsel for the plaintiff was permitted to utilize, in his direct examination of Dr. Wender, interoperative photographs of the additional surgery, which were not made known to defense counsel until after the direct examination commenced, the trial court anomalously prohibited Dr. Umlas from testifying based upon the photographs or independently providing his reasons why the additional surgery performed by Dr. Wender was unnecessary. Although we might be able to approve the trial court’s limitation on Dr. Umlas’ testimony in this case on these facts alone, we are compelled to conclude the trial court abused its discretion in declining to permit Dr. Umlas the full explanation of his opinion when it is further understood that counsel for the plaintiff at all times maintained he did not take Dr. Umlas’ deposition because he already knew what he was going to say. Tr. vol. VIII, p. 732, 1. 10-15.
 
 See Gouveia v. Phillips,
 
 823 So.2d 215, 221 (Fla. 4th DCA 2002) (citing
 
 Binger,
 
 401 So.2d at 1310;
 
 Perryman v. Crawford
 
 968 So.2d 83, 85 (Fla. 4th DCA 2007) (stating that “surprise, changed or undisclosed expert testimony” is the key to a finding of prejudice);
 
 Belmont v. N. Broward Hosp. Dist.,
 
 727 So.2d 992, 994 (Fla. 4th DCA 1999) (reversing and remanding for new trial where defense doctors surprised and prejudiced plaintiff by altering previous testimony in the middle of trial)). Of course, it was equally inappropriate for the court to permit, over objection, the reading to the jury the substance of the facts and circumstances of other cases in which Dr. Umlas had testified.
 
 See Manhardt v. Tamton,
 
 832 So.2d 129, 131-32 (Fla. 2d DCA 2002).
 

 Appellate counsel for Caiaffa
 
 [7]
 
 seeks to shift the focus away from the issues raised by Chin in this case by launching a coun
 
 *311
 
 ter-attack on the defense litigation tactics, arguing that, in the face of admitted liability, the defense chose the theme that this case was a “lawyer driven lawsuit” rather than treating the ease on the merits. As an example of defense counsel misdeeds, Appellee’s counsel quotes the following passage from defense counsel’s opening statement:
 

 This young man «has made, in fact, a remarkable recovery after this accident. He’s made a recovery in every single aspect of every one of his injuries. That is the evidence in this case. And that’s really undisputed. But when this man reached a plateau, when he had gotten good news from all his doctors, there was a change. And this case turned from a medical case where he was making good progress and getting good results to a legal case, the case that’s being presented to you today and over the next course of the next following days.
 

 Tr. vol. IV, p. 307, 1. 14-25; p. 308, 1. 1 (emphasis added).
 

 You’ll see that in October at the same time that he’s getting all this good news from Dr. Ceballos and the therapist, there is a visit to Dr. Wender that you’re going to see maybe today. There’s a visit that’s scheduled by plaintiff’s counsel. It’s [a] phone call that’s placed. And he begins to treat now with a different group of doctors. And now that’s when this case turns. You start seeing a difference in the prognosis. Now the plaintiff at the same time that he is getting all this remarkable recovery documented, you start seeing that he’s limping. You’re going to start hearing that he’s got pain. You’re going to start hearing that he’s got reduced range of motion. You’re also going to hear a new injury — the ankle. You’re going to hear that he got a new injury from this accident.
 

 Tr. vol. IV, p. 310,1. 24-25; p. 311, 1. 1-16 (emphasis added). She further asserts inaccurately that defense counsel, throughout closing, displayed a PowerPoint slide with the phrase “Lawyer-Driven Lawsuit.”
 
 [8]
 
 As previously indicated, there is record support for the proposition that Caiaffa’s course of treatment completely changed after he began to visit Dr. Wen-der. An inference can be drawn, and therefore a good faith argument made, that the referral by Mr. Simon contributed to the claims made by Caiaffa.
 

 We do not in this instance mean to disparage counsel for the plaintiff. The legal profession has as much right as anyone else to make an appropriate referral to other professionals. However, if there is evidence that such activity is occurring solely for personal financial profit, then the jury also is entitled to have those facts brought before them for consideration. Moreover, we need not engage in exhaustive examination of the conduct of defense counsel in order to decide this case. As Senior Judge Schwartz memorably observed more than twenty-five years ago, it is unacceptable “for the judiciary to act simply as a fight promoter, who supplies an arena in which parties may fight it out on unseemly terms of their own choosing.”
 
 Borden, Inc. v. Young,
 
 479 So.2d 850, 851 (Fla. 3d DCA 1985).
 

 Instead, we close by reminding all counsel, whoever they might be, that inflammatory and prejudicial comments and improper conduct — including advancing legal arguments which counsel know are not
 
 *312
 
 supportable — will not be condoned by this Court.
 

 Reversed and remanded for a new trial.
 

 [1]
 

 . The comment about Caiaffa having to live "with half his manhood missing" was a veiled reference to the removal of Caiaffa’s right testicle. The evidence, however, was that Caiaffa did not have his testicle removed. Moreover, his own urologist, Dr. William Cohen, testified that tests one year after the accident found his sperm production to be "100% normal,” and that Caiaffa remained fertile.
 

 [2]
 

 . Caiaffa continued under the care of Dr. Ceballos for four more months after he was referred to Dr. Wender.
 

 [3]
 

 . The initial surgery was performed on Caiaf-fa by Dr. Ceballos in May 2005. Dr. Wender performed the second surgery on April 19, 2007. The one-week trial of this case commenced on Monday, October 29, 2007.
 

 [4]
 

 . Judge Thomas D. Sawaya, Florida Fifth District Court of Appeal.
 

 [5]
 

 . The comparable argument from the transcript of the closing in
 
 SDG Dadeland
 
 reads as follows: “Their defense is in the toilet, and they’re trying to save the day by trying to change his testimony, changing everything he said under oath a few months ago[.]”
 
 SDG Dadeland,
 
 979 So.2d at 1000.
 

 [6]
 

 . Two days later, Mr. Simon extensively cross-examined Dr. Wender's defense counterpart, Dr. Umlas, on his relationship with defense counsel. Appropriately, defense counsel did not object.
 

 [7]
 

 . Appellate counsel did not participate in the trial below.
 

 [8]
 

 . More accurately, the phrase "Driven by Lawyers” appears on but two slides of forty-five, which were utilized during a forty-five-minute closing presentation, covering the entirety of Chin’s defense.