78 So.3d 585 (2011)
Jose DE LEON, Appellant,
v.
GREAT AMERICAN ASSURANCE COMPANY, Appellee.
No. 3D09-646.
District Court of Appeal of Florida, Third District.
October 12, 2011.
Mark J. Feldman, for appellant.
Hinshaw & Culbertson, Maureen G. Pearcy and Luis A. Diz, Miami, for appellee.
Before SHEPHERD and SUAREZ, JJ., and SCHWARTZ, Senior Judge.
*586 SCHWARTZ, Senior Judge.
This is an appeal from an order denying attorney fees under section 627.428 Florida Statutes (2008), in an action for property loss benefits under an automobile insurance policy. The ruling, which was entered even though the insurer settled the case for the full amount claimed, was based on the notion that the action had been premature and unnecessary and was thus not effective in securing the favorable result. See JPG Enterprises, Inc. v. Viterito, 841 So.2d 528, 530 (Fla. 4th DCA 2003) ("A prevailing party is entitled to recover only fees which are `reasonably expended.' Fla. Patient's Comp. Fund v. Rowe, 472 So.2d 1145, 1151 (Fla.1985)."); State Farm Florida Ins. Co. v. Lorenzo, 969 So.2d 393, 398 (Fla. 5th DCA 2007) ("Courts generally do not apply the confession-of-judgment doctrine, which supports awarding attorney fees under statute governing award of fees to insureds in insurance coverage actions, where the insureds were not forced to sue to receive benefits; applying the doctrine would encourage unnecessary litigation by rewarding a race to the courthouse for attorney fees even where the insurer was complying with its obligations under the policy."); Garcia v. Lumbermens Mut. Ins. Co., 246 So.2d 574, 574 (Fla. 3d DCA 1971) ("[I]nterest and attorneys' fees will not be awarded where there is no necessity to institute suit to confirm or collect an arbitration award under an uninsured motorist provision in an automobile liability policy."). This conclusion was in turn based on the finding that the insured had improperly refused to submit to and complete an appropriate and contractually required pre-suit examination under oath. See Lorenzo, 969 So.2d 393 (finding fees improper where insured sued without complying with policy conditions). We disagree with the result below and the premise upon which it was based and therefore reverse.[1]
The controversy began when someone stole a truck owned by De Leon and insured by Great American. When it was recovered, it had been damaged and, most significantly, was missing nine large, valuable tires. As shown by Great American's payment of the entire claim, there was never a legitimate defense under the personal property section of his policy. Unfortunately, however, the carrier apparently decided to use the usual policy provision requiring a sworn statement as a license to make unwarranted and intrusive inquiries into the personal life of any insured who has the temerity to make a claim against it. At the statement, where De Leon appeared without counsel, Great American's lawyer, Luis A. Diz, did not even get to the truck and the tires. Instead, he insisted on probing into the details of, among other things, a prior, totally unrelated criminal conviction,[2] and the person with whom the *588 claimant was then living.[3]
With complete justification, De Leon declined *589 to answer most of these questions, even though Diz specifically warned him that he was jeopardizing his insurance coverage and invited him to withdraw his claim in lieu of responding.[4] In fact De *591 Leon told Diz that if he continued on that track, he would leave, get an attorney, and see him in court.[5] Diz did not desist. He persisted. True to his word, De Leon got a lawyer and filed suit.
The appellee's position is based on the argument that
De Leon's refusal to complete the examination and provide the requested documents prevented Great American from exercising its contractual right to fully investigate his claim.
This is completely wrong; because De Leon "refused" to respond to wholly impertinent and improper questions which had nothing to do with the merits of the claim. And we think he was right to do so. To hold in these circumstances, as did the trial court, that it was not necessary to file the action and thus that section 627.428 is inapplicable, is to turn reality upon its head. What actually happened is that De Leon took Diz up on his challenge (and the propriety of his conduct of the sworn statement) and sued the company because, as was obvious, there was no other way to be paid. So far from being improperly employed, the statute was enacted for the very purpose presented by this caseto discourage the games insurance companies play. See Beverly v. State Farm Florida Ins. Co., 50 So.3d 628, 633 (Fla. 2d DCA 2010) ("[A]n insurer's post-suit payment of additional policy proceeds entitles the insured to section 627.428 attorney's fees where the insurer `wrongfully caus[ed] its insured to resort to litigation in order to resolve a conflict with its insurer when it was within the company's power to resolve it.' See Clifton [v. United Cas. Ins. Co. of Am., 31 So.3d 826, 829 (Fla. 2d DCA 2010)] (citing First Floridian Auto & Home Ins. Co. v. Myrick, 969 So.2d 1121, 1124 (Fla. 2d DCA 2007)); see also Hill, [v. State Farm Florida Insurance Co., 35 So.3d 956, 960-61 (Fla. 2d DCA 2010)]; Goff, [v. State Farm Florida Insurance Co., 999 So.2d 684, 688 (Fla. 2d DCA 2008)]."); see also Pepper's Steel & Alloys, Inc. v. U.S., 850 So.2d 462, 465 (Fla. 2003) ("[t]he statute's [section 627.428] purpose `is to discourage insurance companies from contesting valid claims, and to reimburse insureds for their attorney's fees incurred when they must enforce in court their contract with the insurance company.' Bell v. U.S.B. Acquisition Co., 734 So.2d 403, 411 n. 10 (Fla.1999)."); New York Life Ins. Co. v. Lecks, 122 Fla. 127, 165 So. 50, 54 (1935); Underwood Anderson & Associates, Inc. v. Lillo's Italian Restaurant, Inc. 36 So.3d 885, 888 (Fla. 1st DCA 2010) ("[T]he courts have often stated to be the purpose of the attorney's fee statute, which is to encourage insurance companies to pay when they are presented with valid claims and, failing that, to compensate insureds that are forced to litigate their contracts with improperly recalcitrant insurance companies.").
We cannot permit Great American to escape the consequences of what it tried to get away with in this case. Because the *592 rule that any success in an action on an insurance policy, let alone the full payment of the asserted claim, requires an award of fees, see Pineda v. State Farm Fla. Ins. Co., 47 So.3d 890, 892 (Fla. 3d DCA 2010) ("An insured is entitled to attorney's fees under 627.428, Florida Statutes, where it was reasonably necessary for the insured to litigate in court ...."), applies in spades in this case, the order under review is reversed and the cause is remanded with directions to make an appropriate award of attorney's fees.
Reversed and remanded.
SHEPHERD, J., concurring.
This court recently admonished "all counsel" who practice in the courts of this state that "improper conduct" in the courtroom "will not be condoned by this court." Chin v. Caiaffa, 42 So.3d 300, 311-12 (Fla. 3d DCA 2010) (emphasis added). This case involves conduct outside the courtroom, stemming from the theft of a 2000 Freightliner "eighteen wheeler" commercial truck from the premises of an interstate trucking company where it was parked. The police found the vehicle the next day. The insured's principal claim is that the thieves took ten expensive tires from the truck and replaced them with then-inferior tires. After suit was filed, the trial court abated the action and ordered completion of the previously begun examination under oath (EUO). The same lawyer who conducted the first aborted EUO conducted the second. It lasted over seven hours. It strains credulity to assertas the insurer does in this casethat a seven-hour sworn statement of a single individual is necessary to the investigation of an $8000 tire loss claim, whatever might be the insurer's suspicions. "Over-lawyering" is a frequent affliction found in the legal profession. If there is any question concerning whether the insured's instincts about the interrogator's purpose was any different in the second EUO than in the first, the doubt can be dispelled easily by reviewing the transcript of the latter EUO.
An attorney is an officer of the court, and he plays his role badly, even outside the courtroom, if he trespasses against the obligations of his professional responsibilities. See Georgopoulos v. Int'l Bhd. of Teamsters, AFL-CIO, 942 F.Supp. 883, 905 (S.D.N.Y.1996). A careful review of the transcript of the second EUO reveals the role played by counsel during that EUO was performed just like the first badly. As in the first EUO, counsel's misunderstanding of the permissible range of inquiry in a sworn statement taken to verify a simple theft loss, whatever might have been the insurer's suspicions, was palpable. Upon a review of the entire record, it now is undeniable, in my estimation, that although it should have beenthe insured's claim in this case was not resolvable absent judicial intervention.
With these additional observations, I fully join in the well-reasoned opinion of the court.
NOTES
[1] In happy contrast to such cases as Corey v. Corey, 29 So.3d 315, 321 (Fla. 3d DCA 2009) and cases cited at n. 4 (Schwartz, J. dissenting), in which the tone of the author's dissenting opinions were caused by their having been originally prepared for the court, this one was originally a dissent which, unusually enough, persuaded the previous majority.
[2] The record shows that the following, which is quoted as a never-to-be-emulated model of its kind, occurred:

Q So from 1994 to 2003, you lived in Homestead?
A No. From 1994 to 2000I don't remember when I went to Kentucky and I was in Kentucky until 2003.
Q How long were you in Kentucky, more or less?
A From 1995 until 2003.
Q Okay. Maybe I'm a little confused. The way I understood your testimony was that you livedyou've lived at your current address for approximately three years, four years. You started living there in 2003; is that correct?
A From 2003 until now.
Q Prior to that you lived in Kentucky?
A I lived in Kentucky.
Q From 1995 to 2003 more or less?
A Correct.
Q And that'syou were continually a resident of Kentucky during those eight years?
A Correct.
Q Do you remember the address in Kentucky you resided?
A I don't remember the address.
Q Do you remember the city?
A I was in Lexington and Manchester.
Q Any other cities?
A No.
Q Who did you live with when you resided in Kentucky?
A With Barbara, the mother of my son.
Q Just you and Barbara?
A Yes.
Q You mentioned Homestead. Did you have a house in Homestead?
A Yes.
Q When was that?
A In 1994.
Q How long did you live at the house in Homestead?
A. One year
Q So you had it from 1994 to 1995 more or less?
A Correct.
Q Do you remember where you lived before that?
A In the southwest. In Shenandoah.
Q How long did you live in Shenandoah?
A In 1989 until 1994. '94 that I bought in Homestead.
Q Okay. You mentioned Barbara and the fact that she resided with you in Kentucky. Did anybody else live with you while you were in Kentucky either in Manchester or Lexington?
A Yes. There were more than 2,000 people in the prison. I lived in a facility.
Q What's the name of the facility?
A Federal Correction. Lexington Federal Correction or something like that.
Q You were serving time for a Federal offense?
A Correct.
Q Were you convicted of a crime?
A Correct.
Q What crime?
A Fraud. Cellular phone fraud. Conspiracy for a cellular phone thing, nothing to do, nothing that I did. You see what I'm telling you? What does that have to do with what has to be done. Absolutely nothing.
....
Q What was the facility called, the one that you were residing in in Kentucky?
A I don't remember. I told you I don't know. Lexington, Kentucky, Lexington Medical Center or something like that. Something like that.
Q When you were convicted of the cellular fraud, did you stand trial?
A Correct.
Q Where was the courthouse located, do you remember?
A Downtown.
Q Lexington?
A Miami.
Q You stood trial in Miami?
A Miami.
Q Did you have a lawyer?
A Correct.
Q What's the lawyer's name?
A Juan Gonzalez.
Q Do you know if Mr. Gonzalez is still practicing law in the State of Florida?
A I don't know. I have no idea.
Q When was the last time you spoke to Mr. Gonzalez?
A '94, '95, something like that.
Q Do you remember the specific allegations that were made against you when you stood trial for cellular fraud?
A That was complicated. Because the police came into my house looking for drugs, you understand? And that is something I would not like to talk about it. They came into my house by mistake looking for drugs and when they knocked on the door they even cut my wife, Barbara's, forehead and then they left and they didn't get anything. And they saw that I have neverI don't have anything to doI've never had anything to do with drugs. I've not used drugs, I have not been a drug addict or anything.
Sobut they had some recordings but they could prove there was a telephone and that was all. So they called the Secret Service and those are the ones that came. But look, we go back to the same. Look where we are and we have not talked anything about what I'm here for.
Q What department came to your home?
A The police.
Q Was it Miami-Dade?
A I don't know. I didn't ask them. They were tons of them. You know, if it's a Federal case, you know, the Miami place is not Federal. It's Secret Service, U.S. Customs, and then they called the Secret Service of the United States.
Q Sir, the reason I'm asking you these questions is in case I want to get the records regarding an arrest I need to know specifically where to go.
A The public records. You're an attorney, you know where they are. I know where to go look for a book.
Q Do you have any copies of any documents?
A Yes. I have copy of everything but I cannot give you anything because I have them to defend myself because I was in jail for eight years. And that I'm making a claim and I won my case and I have everything. And I have everything, as you can see here, to defend me. But I can't. What I wanted is finish this now. If you're not going to do it, then okay. I'm going to look for an attorney to make a claim on this and I don't have any problem.
Q What do you mean by you won the case?
A That I won the case.
Q What case?
A The case against the government when they took me into jail.
Q Did you file a civil suit against, the government?
A I'm trying to do a civil lawsuit. I reached the Supreme Court.
Q Have you engaged an attorney in that regard?
A No. I don't have him yet.
Q Would you have any objection if, in the course of our investigation, we request that you sign an authorization directed to Attorney Gonzalez for all records regarding the fraud case, would you be inclined to sign that authorization?
A Not at all.
Q No objection?
A I don't know where he is. I don't know about him.
Q My question is not if you know where the attorney's at. I can get that information.
A My answer is no.
Q You have no objection?
A No. My answer is no.
[3] This passage was as follows:

Q Okay. Is Barbara your wife?
A I refuse to respond.
Q Does Barbara currently reside with you?
A No.
Q Do you have her current address?
A No.
Q Who do you live with at the current address?
A With my wife.
Q What's your wife's name?
A Barbara Castellan.
Q Is that the Barbara you've been referring to during this deposition?
A No.
Q What's the other Barbara's last name?
A Del Castillo.
Q Do you know if she is in Miami?
A No.
Q She's not or you don't know?
A She's not in Miami.
Q Where is she?
A I don't know. I don't know.
Q How long have you been married to Barbara Castellan?
A I'm not married. We just live together.
Q How long have you been living together?
A Around 2003.
Q Does anybody live with you at that address other than Barbara Castellan?
A I'm not married. We just live together.
Q How long have you been living together?
A Around 2003.
Q Does anybody live with you at that address other than Barbara Castellan?
A Her two children.
Q What `are their names and ages, please?
A They have not authorized me to give them to you.
Q Are you denying answering that question?
A Correct.
Q Do you have any kids of your own?
A Yes.
Q What are their names and ages, please?
A Jose De Leon.
Q How old is Jose?
A Twelve years old.
Q Where does he live?
A With the mother.
Q And what's the mother's name?
A Barbara del Castillo.
Q Have you ever been married?
A Yes. Once.
Q With Barbara del Castillo?
A No.
Q Does Jose De Leon live in Miami?
A No.
Q Where does he live?
A I don't know.
Q When was the last time you saw him?
A I don't remember.
Q More than five years?
A I don't remember. Three years, something. I don't remember.
Q When you last saw him was it in Miami?
A Correct.
Q Where?
A I refuse to respond. That has nothing do with this. We go back to the same thing. And to meforgive me for taking this attitude. But I'm tired of this. I'm tired of all these problems. It's been too long and I've lost too much money with this problem. But I'm going to recuperate it for sure.
[4] The colloquy follows:

Q Were you convicted of a crime?
A Correct.
Q What crime?
A Fraud. Cellular phone fraud. Conspiracy for a cellular phone thing, nothing to do, nothing that I did. You see what I'm telling you? What does that have to do with what has to be done. Absolutely nothing.
Q Well, sir, its all relevant. Under Florida law, prior convictions are relevant. And that's something that you have to disclose when you go through a deposition pursuant to Florida law.
A I don't have to do anything. I know a lot about law. Unfortunately, I defended myself and I don't have to answer anything. My record is public. You can get it. I'm not applying to work with the government. I'm not making an application for anything. I'm making a claim. When the insurance company insured my truck, they did not make any investigation, took my check, cashed it and used it however he wanted. Unfortunately, a fatality happened, they stole my truck, there's a camera there. I already told the police to look for the camera and ask for the camera to see who stole the truck. I have nothing to do.
What do you want to do? You want to pay for my truck? Okay. If you don't want to pay for my truck, at least, I'm not going to stay here.
Q We'll get to the incident and your understanding of what happened. I'm just trying to get some background information now.
A But it has nothing do with for you to ask me that.
Q Unfortunately, however you want to look at it, basically it's something that you're duty bound, based on the terms and conditions of the policy issued by Great American
A Obligated to? I'm not obligated. There's other companies. At any timeat no time they told me I had an obligation to say anything. I simply went to get the insurance. I did not get insurance to rob you or to make a fraud or anything. Themy car is there. They broke into my car to steal from it. So what's my need? What do I get out of this? I have my credit there. I have everything that I paid for my tires. Where are my tires?
Q Sir, I can't speak to other insurance policies, what they read or what they require from an insured. I know what Great American requires.
A Correct. That's correct. But when they insured me they didn't say anything, they just took my money. I've always paid, I've never been late. I renewed the insurance and everything and I've never been late. I was very happy with them.
....
Q Would you have any objection if, in the course of our investigation, we request that you sign an authorization directed to Attorney Gonzalez for all records regarding the fraud case, would you be inclined to sign that authorization?
A Not at all.
Q No objection?
A I don't know where he is. I don't know about him.
Q My question is not if you know where the attorney's at. I can get that information.
A My answer is no.
Q You have no objection?
A No. My answer is no.
Q That you have no objection. You would sign an authorization, in other words?
A No.
Q You would not sign an authorization?
A Not at all.
Q Why not?
A Because I don't. I won't. I want to concentrateI go back. If not on thisif I get tic and leave, that's it. I don't want anymore questions. I'm requesting the insurance to return all of the money I've given them from the moment to the policy to give me my money back and I leave as easy as that.
Q Sir, I can't tell you what to do or not do. I'm just hereit's my job to ask you these questions.
A I know. I know. Correct. But concentrate on what it is, not on what is not. I have the right to keep quiet and not respond to anything. That's what I have. I have the right. I want to concentrate on what you're going to ask. If not, I have my papers here. You have a copy of my papers, all my receipts, the bills, everything. If you don't wantif you're not going to talk to me aboutabout what it is, see you next time.
Q Okay. Sir, I can't tell you what to do but you're more than free to withdraw your claim. In fact, it's your choice.
A No, I'm not going to withdraw my claim, no. Please. I'm going to look for an attorney and I want to have the attorney talk to you.
MR. DIAZ [sic]: Off the record for a second.
(Discussion off the record.)
MR. DIAZ [sic]: We're back on. BY MR. DIAZ [sic]:
Q Mr. De Leon, I want to tell you this right now so it's clear for everyone. There's questions I'm going to ask and you may not think they're relevant but they are to me. And I'm just doing my job. Okay? So, if you're not inclined to answer any of my questions, I just want to let you know you may be jeopardizing coverage under the Great American Insurance policy that was issued.
Now that that's on the table and it's clear to everybody here, I'm going to keep on asking questions. If you don't want to answer, I understand that's your personal choice but the caveat is you may be jeopardizing coverage.
Going back to a question I asked previously that I don't believe I got an answer to, can you tell me the specific allegations that were made by the U.S. Government in relation to the cellular fraud claim or cellular fraud charge that they made?
A Absolutely no. Next page.
Q Are you denying to answer the question; are you objecting to it; are you not going to answer it?
A Correct.
Q You said that Barbara was also with you when you were serving time in Kentucky; is that correct?
A I said I'm not going to answer. Next page.
Q Have you ever been convicted of any other crimes?
A I don't know. I deny responding.
Q Are you saying you don't remember or you're making an objection
A I denyI'm not going to respond. I refuse to respond.
....
Q Okay. Have you retained a lawyer regarding the claim that you've made to Great American Insurance Company?
A I don't have it yet but I'm going to have one. There's money for those.
Q Has anyone other than you and Barbara resided at the address you gave us earlier, your current address?
A I don't know. I have no idea.
Q During the time you lived there.
A Those are things that have nothing to do withthose are private things. Are we not in a free country? That has nothing to do anything with this. Please.
Q Are you denying answering the question?
A For sure.
Q Other thanstrike that. You said you were married once; is that correct? A. Look, excuse me. I'm sorry that you came from so far away. But we're not going to get anywhere so I'm leaving and we'll see you in court. And I'll tell you who my attorney is going to be and then we're going to talk. Because nothing is going to be resolved that way.
Excuse me. I know it's your job. And I want to continue because I want to do it and I'm going to go to court because it's my right and you have to pay.
[5] One cannot help but sympathize with De Leon's eloquent statement about the disconnect between the simple facts of his claim and the subject of the interrogation Great American insisted on putting him through:

I'm not making an application for anything. I'm making a claim. When the insurance company insured my truck, they did not make any investigation, took my check, cashed it and used it however he wanted. Unfortunately, a fatality happened, they stole my truck, there's a camera there. I already told the police to look for the camera and ask for the camera to see who stole the truck. I have nothing to do.
What do you want to do? You want to pay for my truck? Okay. If you don't want to pay for my truck, at least, I'm not going to stay here.