# Third District Court of Appeal

## State of Florida

Opinion filed December 26, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-1634
Lower Tribunal No. 13-6984

_____

## R.J. Reynolds Tobacco Company,
Appellant/Cross-Appellee,

vs.

## Diane Schleider, etc.,
Appellee/Cross-Appellant.

An Appeal from the Circuit Court for Miami-Dade County, Sarah I. Zabel, Judge.

King & Spalding LLP, and William L. Durham II, Chad A. Peterson, Val Leppert (Atlanta, Georgia), and Scott M. Edson and Ashley C. Parrish (Washington, DC); Carlton Fields Jorden Burt, P.A., and Benjamine Reid, Douglas J. Chumbley, Jeffrey A. Cohen, and Olga M. Vieira, for appellant/cross-appellee.

Alex Alvarez; Gary M. Paige (Davie, Florida); The Mills Firm, P.A., and John S. Mills and Courtney Brewer (Tallahassee), for appellee/cross-appellant.

Before ROTHENBERG, C.J., and EMAS and LOGUE, JJ.

LOGUE, J.

R.J. Reynolds Tobacco Company appeals the final judgment entered in favor of Diane Schleider, the wife and personal representative of the Estate of Andrew Schleider, and Suzanne LeMehaute, their daughter. We affirm and write only to address R.J. Reynolds' challenge to the closing arguments and the size of the damage awards.

Background

Andrew Schleider, a cigarette smoker, died from lung cancer and chronic obstructive pulmonary disease. His wife sued R.J. Reynolds for wrongful death in her capacity as personal representative of his estate alleging she and their daughter were statutory survivors within the meaning of Florida's Wrongful Death Act. The complaint alleged the father was a member of the class created in Engle v. Liggett Group., Inc., 945 So. 2d 1246 (Fla. 2006). Under Engle, if the plaintiff qualifies as a member of the class, certain facts are found against the defendant tobacco company as a matter of res judicata without the need of further proof.[1]

---

[1] The findings include:

> (i) "that smoking cigarettes causes" certain named diseases including COPD [chronic obstructive pulmonary disease] and lung cancer; (ii) "that nicotine in cigarettes is addictive;" (iii) "that the [Engle] defendants placed cigarettes on the market that were defective and unreasonably dangerous;" (iv) "that the [Engle] defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both;" (v) "that the [Engle] defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive

2

One of the prerequisites for Engle class membership is that the decedent's disease manifested on or before November 21, 1996. Id. at 1275. The issue of when the father's disease manifested was one of the main issues at trial and the jury's finding in favor of the wife and daughter is challenged on appeal, but we affirm that point without discussion.

The trial spanned nearly three weeks. In addition to the evidence presented at trial, the jury was instructed on specific findings it must apply if, as occurred, Schleider was found to be a member of the Engle class. The instructions read to the jury were:

1. Smoking cigarettes causes lung cancer.

2. Cigarettes that contain nicotine are addictive.

3. Defendant, R.J. Reynolds Tobacco Company, placed cigarettes on the market that were defective and unreasonably dangerous.

4. Defendant, R.J. Reynolds Tobacco Company, concealed or omitted material information not otherwise known or available knowing that the material was false and misleading or failed to disclose a material fact

---

nature with the intention that smokers and the public would rely on this information to their detriment;" (vi) "that all of the [Engle] defendants sold or supplied cigarettes that were defective;" (vii) "that all of the [Engle] defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by said defendants;" and (viii) "that all of the [Engle] defendants were negligent." Id. at 1276–77.

Philip Morris USA, Inc. v. Douglas, 110 So. 3d 419, 424-25 (Fla. 2013) (footnote omitted).

3

concerning the health effects or addictive nature of smoking cigarettes or both.

5. Defendant, R.J. Reynolds Tobacco Company, entered into an agreement with other companies and industry organizations to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. Those companies include Philip Morris, USA, Inc., Lorillard Tobacco Company, Lorillard, Inc., Brown & Williamson Tobacco Corporation, individually and as a successor by merger to the American Tobacco Company, and Liggett Group, Inc. The industry organizations are the Council for Tobacco Research USA, Inc., and the Tobacco Institute, Inc.

Defendant R.J. Reynolds Tobacco Company was negligent. These findings may not be denied or questioned and they may carry – they must carry the same weight they would have if you had determined them yourselves.

. . . .

The findings may not be considered in any way when determining whether punitive damages may be warranted. You must make your determination regarding whether punitive may be warranted based only upon the factual evidence presented to you in the trial.

(Emphasis added). These instructions specified that R.J. Reynolds intentionally concealed facts regarding the dangers and addictive qualities of cigarettes.

Evidence was presented throughout the trial indicating the tobacco industry spent approximately $250 billion dollars between 1940 and 2005 to promote and advertise cigarettes. The jury also heard evidence regarding the tobacco industry's lobbying efforts and attempts to conceal the hazards of smoking. In addition, the

4

jury heard from R.J. Reynolds' own corporate representative that 400,000 to 480,000 people were dying each year from smoking cigarettes.[2]

During the closing arguments addressing entitlement to punitive damages, the Plaintiffs' attorney made various arguments dramatizing the number of deaths caused by cigarettes and the size of the sums spent to promote smoking and conceal its dangers. In particular, he noted that 450,000 deaths equate to three plane crashes every day for a year. He also asked the jury to compare the attempts of Mr. Schleider, an individual addicted to nicotine, to stop smoking with the $250 billion spent by the tobacco industry "with all their power, all their money" to encourage people like the plaintiff to continue smoking.

Regarding the damages awards, the jury heard testimony from the wife regarding her husband's illness, the difficulties they endured, and the impact his suffering and death had upon their lives and future plans. The jury heard from the wife how she and her husband had been married for thirty years and how his death came shortly after commencing their retirement in the Florida Keys.

The jury heard the daughter was twenty-two years old when her father died. The father had been a stay-at-home parent who raised her. She followed her parents to the Keys, first to live with them, and then to live near them. She saw her father

---

[2] The deposition testimony of James Figlar, PhD, where he appeared as corporate representative for R.J. Reynolds in another case, was read to the jury in this case. The jury also viewed Dr. Figlar's videotaped deposition taken in this case.

continually and provided care for him up to his death. At her wedding, she refused to have anyone walk her down the aisle in her father's absence.

In closing argument, Plaintiffs' counsel requested an award of non-economic damages for loss of companionship and protection and mental pain and suffering in the amounts of $11 million to the wife and $7 million to the daughter. Plaintiffs' counsel informed the jury that they "could go lower . . . or higher, it's completely within [the jury's] province to do." On rebuttal, Plaintiff's counsel again requested those amounts and argued that the figures represented, "fair compensation:" "if we could ask for more compensatory damages, I assure you that we would have." R.J. Reynolds's counsel immediately objected on the basis, stated in front of the jury, that "there is no limit on what they can ask for."

The jury ultimately awarded $15 million in non-economic damages to the wife and $6 million to the daughter, but refused to award the requested punitive damages. Regarding comparative negligence, Plaintiffs' counsel requested the jury find R.J. Reynolds 87.5% at fault and the decedent 12.5% at fault. The jury instead found R.J. Reynolds 70% at fault and the decedent 30% at fault. Following the application of comparative fault, the final judgment awarded $10.5 million to the wife and $4.2 million to the daughter.

Among other motions, R.J. Reynolds moved for a new trial on damages and for remittitur. The motions were denied and this appeal followed.

6

<u>Analysis</u>

R.J. Reynolds first argues that Plaintiffs' counsel made improper arguments during closing which warranted a new trial. We review the trial court's denial of the motion for a new trial under an abuse of discretion standard. <u>See</u> <u>Engle</u>, 945 So. 2d at 1271 ("A trial court's order granting or denying a motion for a new trial based on either objected-to or unobjected-to improper argument is reviewed for abuse of discretion."). "If the issue of an opponent's improper argument has been properly preserved by objection and motion for mistrial, the trial court should grant a new trial if the argument was so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial." <u>Id.</u> (quotation omitted).

While we do not condone the closing argument comments to which R.J. Reynolds objected, we conclude that the complained-of comments fall short of denying R.J. Reynolds its right to a fair trial. In reviewing the comments, it is important to remember their context. This case was a nearly three-week-long bifurcated <u>Engle</u> progeny case involving claims for intentional and non-intentional torts and prayers for non-economic compensatory damages flowing from Plaintiffs' loss of companionship and protection and pain and suffering, as well as for punitive damages.

Arguments inappropriate in a simple negligence case may be appropriate concerning record evidence of a parties' intentional misconduct in the context of a

7

claim for punitive damages. To give an obvious example, it is generally reversible error in a simple tort case seeking compensatory damages to ask a jury to "send a message" and punish or penalize the defendant. <u>See</u>, <u>e.g.</u>, <u>Erie Ins. Co. v. Bushy</u>, 394 So. 2d 228, 229 (Fla. 5th DCA 1981). Here, however, the jury was instructed to consider whether R.J. Reynolds committed intentional misconduct, meaning "Reynolds had actual knowledge of the wrong of the conduct and the high probability that injury would result and, despite that knowledge intentionally pursued that course of conduct," in which event the jury was directed to consider the propriety of punitive damages "as a punishment to Reynolds and as a deterrent to others."

R.J. Reynolds complains about the way Plaintiffs' counsel in closing noted that the 450,000 deaths from smoking annually equated to three airline crashes per day every day for a year. Although provocative and even somewhat inflammatory, the comparison itself was mild considered the magnitude of the number of deaths due to smoking (400,000 to 480,000 deaths annually) which was testified to by R.J. Reynolds' own corporate representative. The Surgeon General of the United States and the Connecticut Public Health Policy Institute have made this same, or similar comparison.[3]

---

[3] <u>See</u> C. Everett Koop, <u>Don't Forget the Smokers</u>, Washington Post, March 8, 1998, https://www.washingtonpost.com/archive/opinions/1998/03/08/dont-forget-the-smokers/3560fbed-880a-45ff-8669-110fd8b63509/?utm_term=.9c67a0fe6169;

Among other things, this comparison was probative of whether R.J. Reynolds had actual knowledge of its wrongdoing "and the high probability that injury would result." In the context of this trial, it appears that Plaintiffs' counsel was simply illustrating or contextualizing the number of smoking-related deaths in an attempt to establish entitlement to punitive damages. Importantly, the jury was repeatedly informed and instructed that they were to assess damages only for the harm caused to the individual plaintiffs in this case. The jury ultimately did not award any punitive damages.

Nevertheless, R.J. Reynolds contends this argument requires reversal under cases such as Walt Disney World Co. v. Blalock, 640 So. 2d 1156 (Fla. 5th DCA 1994). Blalock involved a lawsuit filed by the parents of a child who had his thumb amputated while on the Pirates of the Caribbean ride at Walt Disney World. The jury entered a verdict in favor of the plaintiff and Walt Disney World appealed. On appeal, the Fifth District noted that counsel for the plaintiff in closing "express[ed] his personal opinion that it was 'outrageous' for [Walt Disney World] to assert its defense of contributory negligence-despite evidence that the minor plaintiff and his

Joseph Cooney, et al., Examining Tobacco Use, Consequences and Policies in Connecticut: Smoke and Mirrors?, The Connecticut Public Health Policy Institute, April 28, 2010, at 6.

9

father had been told to keep their arms inside the boat at all times and an admission that the boy's hand had been in the water." Id. at 1157-58.

Moreover, in Blalock, the plaintiffs' "[c]ounsel also expressed his personal opinion on the credibility of several [Walt Disney World] witnesses, contrary to Rule 4-3.4(e) of the Florida Bar Rules Governing Professional Conduct." Id. at 1158. Beyond that, "other [Walt Disney World] witnesses were sarcastically referred to as 'a good soldier' or 'this joker' to derogate them, and [Walt Disney World] was compared to 'some nickel and dime carnival' throwing 'pixie dust' to delude the jurors." Id. The court concluded that the closing argument in Blalock was "pervaded with inflammatory comments and the personal opinion of counsel." Id. at 1157. The comments in Blalock were unconnected to the evidence. They were not made to place the gravity of certain evidence in context, but rather, amounted to an expression of personal opinion in violation of the rules governing professional responsibility. The comments also violated well-settled black letter law by inviting the jury to consider matters outside of the evidence based on the denigration of witnesses. [4]

---

[4] We also note that in Blalock, the plaintiff's expert began telling the jury of Walt Disney World's post-accident remedial measures, apparently unaware of the court's in limine order precluding same. Blalock, 640 So. 2d at 1158. The court also considered the impact of the attorney's conduct during closing in light of the $275,000 future medical expenses award for which "[t]here was no evidentiary basis . . . and had not even been sought in the closing argument." Id. at 1159.

Other cases cited by the R.J. Reynolds are equally distinguishable. For example, in DeFreitas v. State, 701 So. 2d 593 (Fla. 4th DCA 1997), the criminal defendant was accused of pointing a laser-sighted firearm at two individuals. The Fourth District concluded there were several instances of prosecutorial misconduct warranting reversal. The misconduct included: (1) "the prosecuting attorney . . . suggesting or inferring on cross-examination . . . that Appellant was a person with a temper which perhaps was so bad that it led him to hitting his own sister in the head with a baseball bat," even though any such evidence was inadmissible; (2) the prosecutor made a golden rule argument during closing, by asking the jurors to consider how terrifying it would have been for any given juror to have had the gun at issue pointed at his or her chest by the defendant; and (3) the prosecutor impermissibly made a comparison in closing between the defendant's case and the O.J. Simpson case. Id. at 601. The O.J. Simpson "reference, coupled with the reference to [the defendant] as a stalker, possessive ex-boyfriend who disapproved of his ex-girlfriend's friends, simply crossed the line of proper vigorous and diligent advocacy and violated the rule against inflammatory argument." Id.

Notably, the court specifically stated that "the prosecutor's reference to the O.J. Simpson [case], standing alone, may not have been sufficient to reach the very heart of [the defendant's] criminal trial and may not have risen to the level of fundamental error; however its contribution to the cumulative effect of the totality

11

of the misconduct reached far beyond that which the right to a fair criminal trial allows." Id. Defreitas is therefore distinguishable because it involves a cumulative impact and level of attorney misconduct which is not present in the case before us.

R.J. Reynolds also contends reversal is warranted because the Plaintiffs' counsel compared the efforts of the plaintiff to quit smoking with "all their power, all their money" (referring to R.J. Reynolds and other tobacco companies) spent to encourage individuals like Mr. Schleider to keep smoking. After the parties went to sidebar and the Plaintiffs' counsel explained the comment, the court allowed him to rephrase before the jury. The Plaintiffs' counsel then proceeded to remind the jury of the testimony regarding the amount of $250 billion dollars spent between 1940 and 2005 on cigarette advertising and promotion. Counsel further clarified the "power" comment by reminding the jury of the evidence presented regarding the lobbying efforts of the tobacco companies to influence Congress. R.J. Reynolds did not object to the explanation made by the Plaintiffs' counsel.

When these comments are placed in the unique context of the evidence presented at this trial, the comments related to "wealth" and "power" do not merit reversal. In this regard, Samuels v. Torres, 29 So. 3d 1193 (Fla. 5th DCA 2010), relied upon by R.J. Reynolds, is not comparable. Samuels was injured in an automobile accident caused by Torres and filed suit against him. The first trial resulted in a mistrial due to improper comments of Torres' defense counsel

suggesting that Torres could not afford to pay a substantial award. During opening statements in the second trial, the defense attorney gave "a little bit of background on Mr. Torres" which amounted to telling the jury of Mr. Torres' work as a truck driver and the meager nature of his earnings. Id. at 1195-96.

The Fifth District noted that "[w]hen counsel for Torres revealed the meager income of his client, a juror began to cry and told the trial judge that the stories she heard were 'sad.'" Id. at 1196-97. Furthermore, despite the fact that "Samuels presented significant evidence regarding her injuries," and evidence regarding a $60,000-$80,000 future spinal surgery, the jury only awarded the future medical expenses in "the sum of $1,000 per year of her projected thirty-four years of remaining life, an award completely devoid of evidentiary support" which the trial court believed "is explainable only as a result of the prejudicial statement made about the irrelevant issue of Torres' meager income." Id. at 1197. This is not what occurred in the case before us.

Finally, R.J. Reynolds contends that plaintiffs' counsel improperly denigrated the defense. After carefully reviewing the transcript, we reject this argument. Plaintiff's attorney in closing was in the middle of saying "so in fact they still, still, to this day, trying to pretend like they . . . " when his statement was interrupted by an objection and he was ordered to move on, which he did. While some of Plaintiffs' counsel's comments approached the boundary of what constitutes proper argument,

13

they did not rise to the requisite level to warrant a new trial. The evidence at trial, as well as the jury instructions, demonstrated that R.J. Reynolds affirmatively attempted to conceal from the public information regarding the health dangers of cigarettes. Furthermore, testimony demonstrated that at one point, when public service announcements were shown along with cigarette ads, tobacco companies attacked the public service announcements, calling them false and misleading. Evidence at trial also showed that executives within the tobacco industry actively disputed – if not misrepresented – the harmful effects of cigarettes despite available scientific proof at the time.

"Attorneys should be afforded great latitude in presenting closing argument, but they must 'confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence.'" Murphy v. Int'l Robotic Systems, Inc., 766 So. 2d 1010, 1028 (Fla. 2000) (quoting Knoizen v. Bruegger, 713 So. 2d 1071, 1072 (Fla. 5th DCA 1998)). Plaintiffs' counsel's comments during his closing argument in this case may be considered to be close to the limits of what is acceptable. Indeed, they may well justify reversal in a different context. In the context of the evidence of this particular trial, however, we find that the comments did not rise to a level that requires reversal.

This conclusion is particularly compelling here because the trial spanned nearly three weeks and closing argument ended on a Friday. The jury returned the

following Monday, engaged in two days of deliberation, and found in favor of R.J. Reynolds on the question of punitive damages and concealment; awarded less than the compensatory amount requested for the daughter; and attributed a higher percentage of comparative negligence to Schleider than what Plaintiffs' counsel argued for in closing. These actions by the jury strongly indicate the jury was not inflamed, prejudiced, or improperly mislead by closing arguments.

This brings us to R.J. Reynolds' main argument on appeal. R.J. Reynolds' main argument on appeal concerns the trial court's denial of its motions for remittitur and a new trial on damages. It contends the amounts awarded by the jury of $15 million to the wife and of $6 million to the daughter are excessive. The award of money damages for pain and suffering reflects an attempt to establish an objective economic equivalent for the subjective pain a person suffered. It has been described as "an attempt to 'measure that which is immeasurable.'" Ortega v. Belony, 185 So. 3d 538, 540 (Fla. 3d DCA 2015) (quoting Food Fair Stores, Inc. v. Morgan, 338 So. 2d 89, 92 (Fla. 2d DCA 1976)).

Because of the inherent difficulty in measuring non-economic damages such as pain and suffering, the Florida Supreme Court has determined that "[t]he jury, guided by its judgment and everyday life experiences, is in the best position to make a fair assessment of these damages." Odom v. R.J. Reynolds Tobacco Co., No.

15

SC17-563, 2018 WL 4496563, at *6 (Fla. Sept. 20, 2018) (quoting <u>Angrand v. Key</u>, 657 So.2d 1146, 1149 (Fla. 1995)). As the Supreme Court has further explained:

> Jurors know the nature of pain, embarrassment and inconvenience, and they also know the nature of money. Their problem of equating the two to afford reasonable and just compensation calls for a high order of human judgment, and the law has provided no better yardstick for their guidance than their enlightened conscience. Their problem is not one of mathematical calculation but involves an exercise of their sound judgment of what is fair and right.

<u>Id.</u> (quoting <u>Braddock v. Seaboard Air Line R.R. Co.</u>, 80 So. 2d 662, 668 (Fla. 1955)).

For this reason, a jury's award of damages should not be disturbed unless "it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." <u>R.J. Reynolds Tobacco Co. v. Townsend</u>, 90 So. 3d 307, 311 (Fla. 1st DCA 2012) (quoting <u>Bould v. Touchette</u>, 349 So. 2d 1181, 1184–85 (Fla. 1977)). Moreover, having heard the same evidence as the jury, "[t]he trial court is in the best position to determine whether the compensatory damages award is excessive." <u>Lorillard Tobacco Co. v. Alexander</u>, 123 So. 3d 67, 79 (Fla. 3d DCA 2013). For this reason, "[w]e review the trial court's denial of . . . post-trial motions for remittitur and new trial under the abuse of discretion standard." <u>Maggolc, Inc. v. Roberson</u>, 116 So. 3d 556, 558 (Fla. 3d DCA 2013).

16

The remittitur statute reads in pertinent part as follows:

(1)   In any action to which this part applies wherein the trier of fact determines that liability exists on the part of the defendant and a verdict is rendered which awards money damages to the plaintiff, it shall be the responsibility of the court, upon proper motion, <u>to review the amount of such award to determine if such amount is excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact.</u>

. . . .

(3)   It is the intention of the Legislature that awards of damages be subject to close scrutiny by the courts and that all such awards be adequate and not excessive.

. . . .

(5)   In determining whether an award <u>is excessive or inadequate in light of the facts and circumstances presented to the trier of fact</u> and in determining the amount, if any, that such award exceeds a reasonable range of damages or is inadequate, the court shall consider the following criteria:

> (a)   Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
>
> (b)   Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
>
> (c)   Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
>
> (d)   Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and

17

(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

(6) It is the intent of the Legislature to vest the <u>trial courts</u> of this state with the discretionary authority to review the amounts of damages awarded by a trier of fact in light of a standard of excessiveness or inadequacy. <u>The Legislature recognizes that the reasonable actions of a jury are a fundamental precept of American jurisprudence and that such actions should be disturbed or modified with caution and discretion.</u> However, it is further recognized that a review by the courts in accordance with the standards set forth in this section provides an additional element of soundness and logic to our judicial system and is in the best interests of the citizens of this state.

§ 768.74, Fla. Stat. (2014) (emphasis added).

None of the factors set forth in the remittitur statute to justify a reduction are present here. The jury did not find in favor of the Plaintiffs on all counts. The jury apportioned a greater percentage of fault to the decedent than requested by Plaintiffs. The jury awarded the daughter less than she sought. Lastly, the jury elected not to award punitive damages. Indeed, the jury awarded the wife $15 million when she only requested $11 million, but both counsel for Plaintiff and counsel for R.J. Reynolds told the jury there was no limit on what the plaintiff could request and counsel for R.J. Reynolds suggested no actual number to the jury. On balance, we find nothing to suggest impropriety, partiality, or a runaway jury.

"Under Florida law an award of non-economic damages must bear a reasonable relation to the philosophy and general trend of prior decisions in such

18

cases." Philip Morris USA Inc. v. Cohen, 102 So. 3d 11, 18 (Fla. 4th DCA 2012), quashed on other grounds in R.J. Reynolds Tobacco Co. v. Cohen, No. SC13-35, 2016 WL 375143 *1 (Fla. Jan. 26, 2016) (quoting Bravo v. United States, 532 F.3d 1154, 1162 (11th Cir. 2008)). Here, the awards do precisely that.

The award of $15 million is indeed higher than awards in the $10 to $12.5 million range previously upheld by this and other courts. See, e.g., Philip Morris USA, Inc. v. Cuculino, 165 So. 3d 36, 39 (Fla. 3d DCA 2015) (upholding $12.5 million verdict)[5]; Alexander, 123 So. 3d at 76-79 (upholding trial court's reduction of $20 million verdict to $10 million); Philip Morris USA, Inc. v. Kayton, 104 So. 3d 1145, 1147 (Fla. 4th DCA 2012) (upholding $8 million compensatory damages award but reversing $16 million punitive award for determination of statute of repose issue), quashed on other grounds in Kayton v. Philip Morris USA, Inc., Nos. SC13-171, SC13-243 (Fla. Feb. 1, 2016) (summarily quashing decision and reinstating jury verdict); Cohen, 102 So. 3d at 19 (upholding $10 million compensatory damages, but reversing $10 million punitive damages for determination of statute of repose issue); Townsend, 90 So. 3d at 307 (upholding a $10.8 million compensatory damages award and $80 million in punitive damages).[6]

---

[5] The Cuculino jury apportioned 60% of the fault to Mr. Cuculino, reducing the actual award to $5 million. Cuculino, 165 So. 3d at 39.

[6] The Townsend jury found R.J. Reynolds to be 51% responsible for the death of Mr. Townsend, reducing the jury award in accordance with the allocation of

However, these awards from other cases do not establish a cap on non-economic damages for surviving spouses in the amount of $10 million for all time and for all circumstances. As the Supreme Court recently noted, "neither the Legislature nor this Court has limited or established a bright-line cap on the amount a survivor may be awarded in noneconomic damages under the wrongful death statute." Odom, 2018 WL 4496563, at *9.

Moreover, the award here is only a fraction higher—not multiple times higher—than those previously upheld. Cf. Rety v. Green, 546 So. 2d 410, 420 (Fla. 3d DCA 1989) (reversing denial of remittitur of award "nearly twenty times higher than any libel verdict which has ever been upheld on appeal in Florida or elsewhere"). This award therefore cannot be said to be "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." Bould, 349 So. 2d at 1184–85.

Considering the unique facts of this case and weighing the evidence, the jury made its determination that a $15 million award to the wife was warranted. The jury heard significant evidence in support of the wife's loss of consortium and pain and suffering claims. The jury heard evidence that Schleider was fifty-six and his wife

---

percentage of fault. The trial court entered a judgment against R.J. Reynolds in the amount of over $46 million, consisting of approximately $5.5 million in compensatory damages and $40.8 million in punitive damages.

20

was fifty-five at the time of his death; they had been married for thirty years, and had four children. Schleider had become disabled and, as a result, was a stay-at-home parent and the primary caregiver for their family. The wife had just retired and the couple moved to the Florida Keys when Schleider was first diagnosed. He passed away within roughly two years. During that time, the wife watched as Schleider withered away and suffered.

By the end, he had lost all of his hair, he could not use the commode by himself (which was kept next to his bed because he could not walk to the bathroom), and was being daily administered morphine for his pain. After testifying about the suffering she witnessed, she said, "I do not want to ever see anybody else suffer like that." Even twenty years later, the wife has never remarried. The Plaintiffs also published certain life expectancy tables to the jury to establish the duration of loss. The trial court, having heard the same testimony the jury relied upon, upheld the jury's award. Given the evidence presented, fifteen million dollars for the loss of a spouse as the wife embarked on her retirement and the couple moved to the Florida Keys may be more than what we would have awarded as jurors, but it is not so inordinately large as to justify reversal of the jury award and the trial court in this case.

Similarly, the jury determined that a $6 million award to the daughter – $1 million less than what Plaintiff requested – was appropriate. R.J. Reynolds primarily

21

relies on a number of cases involving damages awards to adult children to establish that the award in this case is an outlier, and therefore, excessive. However, a comparison of this award to cases involving adult children is inappropriate because the daughter was not an adult child under the statute. Florida's Wrongful Death Act expressly permits recovery of damages by either a decedent's surviving spouse, surviving minor child, or both. § 768.21(1)-(3), Fla. Stat. (permitting recovery for loss of parental companionship and pain and suffering for a surviving adult child only where there is no surviving spouse). In doing so, the statute defines a minor as a child "under 25 years of age, notwithstanding the age of majority." § 768.18(2), Fla. Stat. Here, the Schleider's daughter was twenty-two years old, and thus a statutory minor, when her father died.

The jury heard the daughter's testimony regarding her father's presence in her life and the closeness of their relationship. She testified that he was the primary caregiver, "Mr. Mom," and the primary source of support and guidance in her life. She moved from New York to the Florida Keys to be closer to her parents and, once her father got sick, she helped take care of him. The jury also heard that no one walked her down the aisle at her wedding. The jury heard that she is unable to speak about his death even 20 years later because "the way he died" causes her to cry. She explained that she began experiencing and still has panic attacks to this day as a result of his death.

We simply cannot draw a bright line establishing a particular age involving a surviving minor under Florida's Wrongful Death Act that would warrant a lesser or greater award. Children will have different relationships with parents. Some parents will be close, as was the case here; some not. An inquiry into this matter is factually intensive and turns largely on the nature and credibility of the evidence presented, not merely the age of the surviving child.

There are few published opinions for comparison. However, the award in this case falls squarely within the realm of those awards. At the outset, we acknowledge the cases where appellate courts have reversed jury awards of $6 million to adult children as excessive. See Philip Morris USA Inc. v. Putney, 199 So. 3d 465, 470-71 (Fla. 4th DCA 2016) (concluding that $5 million award to each of three surviving adult children of the deceased smoker was excessive and there was no evidence "of the type of close or supportive relationship that would justify such an award")[7]; R.J. Reynolds Tobacco Co. v. Webb, 93 So. 3d 331, 337 (Fla. 1st DCA 2012) (reversing an $8 million award to an adult surviving child of a cigarette smoker who was fifty-four years old when her father passed away on the basis that it was excessive as compared to other similar Engle awards).

---

[7] The initial brief in Putney indicated that the adult children were each in their thirties and living independently. Initial Brief for Appellant Philip Morris USA Inc. and R.J. Reynolds Tobacco Company at 20, Philip Morris USA Inc. v. Putney, 199 So. 3d 465 (Fla. 4th DCA 2016) (Nos. 4D10-3606 & 4D10-5244 Consol.).

But we do not read these cases as establishing a cap for minor children for all time and all circumstances. Indeed, a court has upheld awards of $7.5 and $4 million to surviving minor children under similar circumstances. R.J. Reynolds Tobacco Co. v. Grossman, 211 So. 3d 221, 229 (Fla. 4th DCA 2017), review denied, No. SC17-706, 2017 WL 3751318, review granted on other grounds, No. 17-688, 2018 WL 3097036, remanded on other grounds to 4D13-3949, 2018 WL 3375363 (Fla. 4th DCA July 11, 2018). A court has also upheld an award of $4.4 million to a surviving minor whose mother was killed instantly in a car accident. See Citrus County v. McQuillin, 840 So. 2d 343, 347-48 (Fla. 5th DCA 2003). Moreover, as noted above, the Supreme Court recently held that "neither the Legislature nor this Court has limited or established a bright-line cap on the amount a survivor may be awarded in noneconomic damages under the wrongful death statute." Odom, 2018 WL 4496563, at *9.

Given the extremely fact-specific nature of the individual relationships that are a basis for a compensation award to a minor statutory survivor, it is only natural that jury verdicts will vary. The problems of determining the nature of these relationships and a commensurate award goes to the heart of why we use juries to set the amount. While we entertain notions that an award may "raise judicial eyebrows" or "shock the judicial conscience," we have yet to establish an objective measure to evaluate when a jury's award for pain and suffering is too large or too

24

small. In deciding whether to grant remittitur, the trial court has wide discretion precisely because it has a better vantage to determine whether an award is excessive. In contrast, as appellate courts, having only the cold transcripts before us, we lack the vantage of the trial courts in these matters.

The dissent somewhat summarily concludes that there is nothing "unique" about the daughter's suffering. We are reminded of Tolstoy's observation that "all happy families are alike; each unhappy family is unhappy in its own way." Reflecting this wisdom, our system of laws leave the nature and extent of the daughter's suffering to the province of the jury, and then to the trial judge who actually saw and heard the testimony. Particularly, as appellate judges with only the cold record before us, we "must resist the urge to 'declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed.'" Odom, 2018 WL 4496563 at 9 (quoting Bould, 349 So. 2d at 1184).

Here, we find no abuse of discretion by the trial court in denying remittitur or a new trial on the awards to the wife and daughter.

Affirmed.

EMAS, J., concurs.

25

ROTHENBERG, C.J. (dissenting).

The majority opinion makes a valiant attempt to minimize the impact of the improper arguments made by plaintiffs' counsel and to distinguish the cases that have been reversed for similar improper arguments. However, as will be carefully addressed in this dissent, the cumulative effect of the improper arguments in this case, which is not unique in terms of the evidence against R.J. Reynolds, but is unique in the scarcity of evidence in the record to support the exorbitant loss of consortium awards to Mr. Schleider's wife and non-dependent child, requires a new trial.

A new trial is required because the Plaintiffs' counsel made numerous improper and inflammatory closing arguments. These improper arguments, which were repeatedly objected to by R.J. Reynolds, but which were inexplicably overruled or ignored by the trial court, contributed to the very high jury awards and denied R.J. Reynolds of its right to a fair trial. As this dissent will document, the Plaintiffs' closing arguments were highly improper, the trial court erred by overruling R.J. Reynolds' objections and by denying R.J. Reynolds' repeated requests to explain its objections to the trial court at side bar, and the Plaintiffs have failed to demonstrate

26

that these errors are harmless. In fact, the extremely high jury awards demonstrate the opposite. For these reasons, I respectfully dissent. R.J. Reynolds is entitled to a new and fair trial.

The Plaintiffs' improper arguments fall within the following three categories which will be addressed in turn: (1) inflammatory arguments designed to invoke the jury's emotions (sympathy and anger); (2) attacks upon R.J. Reynolds and its counsel for their defense of the case; and (3) comparing R.J. Reynolds' "wealth" and "power" to that of Mr. Schleider, who was alternatively referred to as "just a child" when he began to smoke and "a gentleman who was addicted to nicotine" as an adult.

## I. Plaintiffs' Counsel's Improper Arguments

### A. The Plaintiffs' inflammatory arguments

One of the Plaintiffs' themes in its closing arguments was that the jury should punish R.J. Reynolds for the millions of people (8.5 million, according to the Plaintiffs' counsel) who are currently living with smoking-related illnesses and for the 450,000 Americans who die each year from smoking-related illnesses.

> [Plaintiffs' Counsel]: . . . [T]hese corporations, they can't do this and get away with it. They can't do this for 50 years, 450,000 Americans die every year, okay? And that's a lot of people.
>       . . . .
> [Plaintiffs' Counsel]: So when we talk about 450,000 who die every year, it doesn't seem - - you know, it's a number that maybe you grow numb to, but if you wrap your mind around that number and you think about it, what that means is if there is a plane crash tomorrow and - -

R.J. Reynolds immediately objected and requested to make a motion but the

27

trial court overruled the objection and did not hear R.J. Reynolds' motion. Emboldened by the trial court's ruling, the Plaintiffs' counsel charged forward, building on his plane crash theme and inflaming the jury with not only the number of smoking-related deaths, but by invoking images of plane crashes and the mourning public.

> [Plaintiffs' Counsel]: **So if a plane crashed, it would be big news, right? People would be watching it on CNN and we would watch it and we would feel bad for those families and we would mourn with the families and everybody would feel bad, and it would be horrible. 450,000 is the equivalent –**
>
> [Defense Counsel]: Your Honor, I'm sorry to interrupt. Can I just get a continuing objection?
>
> [The Court]: Yes.
>
> [Defense Counsel]: **I need to make a motion, I have a number of objections to this.**
>
> [The Court]: **That's fine. Thank you.**
>
> [Plaintiffs' Counsel]: The number would be the equivalent in terms of number, **just so you could wrap your mind around the harm being done, of three plane crashes every day for a year**. That would be about 450,000 Americans. **And that's why I say when you consider what they've done, the harm of what they done**. . . . And that's the evidence in this case about how many people have died, and he was just one of them.

(Emphasis added).

These arguments made by the Plaintiffs' trial counsel were not only improper because they were inflammatory, but were also improper because they inferred that

the jury could and should punish R.J. Reynolds for the harm suffered by **all smokers** caused by the **entire tobacco industry**. However, both compensatory and punitive damages in these individual smoker cases must be confined to the damages suffered solely by the plaintiff in each case being tried—not all plaintiffs, all potential plaintiffs, and certainly not all Americans with smoking-related illnesses. Otherwise, juries might, and it appears did in this case, award damages based on the hundreds of thousands of Americans who may have died and who may die in the future from a smoking-related illness and the millions of Americans living with smoking-related illnesses, all of whom were non-parties in the instant litigation.

The Plaintiffs' counsel contends that there was nothing improper about his arguments highlighting the number of smoking-related deaths (allegedly 450,000 each year) and the number of persons living with smoking-related illnesses (allegedly 8.5 million). He also contends there was nothing improper with asking the jury to picture watching CNN reporting on a plane crash and asking the jury to envision how bad "we would feel for those families and we would mourn with the families and everyone would feel bad, and it would be horrible," and then telling the jury to envision that horrible loss extending to 450,000 Americans and to multiply that horror to the horror of three plane crashes every day for a year. The Plaintiffs' counsel contends that his "vivid or descriptive analogy" was utilized to help the jury "grasp the sheer magnitude of the harm caused by RJR's misconduct." But that is

29

exactly why these arguments were improper.

The majority also concludes that because the Plaintiffs were seeking punitive damages in this case, these highly inflammatory arguments were permissible. However, as will be discussed below, that conclusion is in direct conflict with established Florida Supreme Court precedent and constitutional due process. The record also reflects that the Plaintiffs' counsel used the number of smoking-related illnesses and deaths in its plea for the jury to punish RJ Reynolds for an improper purpose. The number of smoking-related deaths or smoking-related illnesses was improperly used by the Plaintiffs to inflame the jury and to seek an award that punished R.J. Reynolds for the alleged injury and death **to non-parties in this case**. The case law is clear on the impropriety of such arguments, as the jury should only have been permitted to consider the damages suffered by the plaintiffs in this case— Mr. Schleider's wife and Mr. Schleider's non-dependent daughter, and to punish R.J. Reynolds for its actions as it relates to the plaintiffs in this case. The Plaintiffs' counsel's impassioned arguments, however, improperly urged the jury to consider the death or injury to millions of non-parties when determining the amount of damages to award in this case, which did not include these non-parties. This violated R.J. Reynolds' constitutional right to due process.

In Philip Morris USA v. Williams, 549 U.S. 346, 349 (2007), when answering "whether the Constitution's Due Process Clause permits a jury to base that award in

30

part upon its desire to *punish* the defendant for harming persons who are not before the court (e.g., victims whom the parties do not represent)," the United States Supreme Court held that "such an award would amount to a taking of 'property' from the defendant without due process." (emphasis in original). Specifically, the United States Supreme Court in <u>Williams</u> made clear that **although punitive damages may be imposed to punish unlawful conduct and to deter its repetition**, <u>id.</u> at 349, "**the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation**." <u>Id.</u> at 353 (emphasis added); <u>see also</u> <u>State Farm Mut. Auto. Ins. v. Campbell</u>, 538 U.S. 408, 420 (2003) (noting that "[T]he Campbells demonstrated, through the testimony of State Farm employees who had worked outside of Utah, and through expert testimony, that this pattern of claims adjustment under the PP & R program was not a local anomaly, but was a consistent, nationwide feature of State Farm's business operations, orchestrated from the highest levels of corporate management," and condemning the Campbells' use of their case as a platform to expose and punish for alleged deficiencies of State Farm's operations throughout the country, rather than for its conduct against the Campbells); <u>Branham v. Ford Motor Co.</u>, 701 S.E.2d 5, 23-24 (S.C. 2010) (finding the most egregious error was "counsel's request that the jury

31

punish Ford for harming others beyond [the plaintiff] . . . [b]y focusing on conduct, as opposed to harm to Branham, the charge invited the jury to punish Ford for all Bronco rollover deaths and injuries"); Durham v. Vinson, 602 S.E.2d 760, 767 (S.C. 2004) (reversing an award of punitive damages because the trial court allowed the jury to punish the defendant for bad acts unrelated to the defendant's actions toward the plaintiff).

The arguments made by Plaintiffs' counsel encouraging the jury to punish R.J. Reynolds for the millions of people who are allegedly living with smoking-related illnesses and for allegedly killing 450,000 Americans each year rather than punishing R.J. Reynolds for its injury to Mr. Schleider and his surviving wife and daughter was, therefore, improper, and the highly inflammatory mental images Plaintiffs' counsel beseeched the jury to envision—three airplanes filled with passengers crashing each day for a year and the pain and suffering of the families and the public at large resulting from viewing the carnage on television—therefore violated both R.J. Reynolds' constitutional right to due process and its right to a fair trial. As the United States Supreme Court in Campbell recognized, to punish a defendant (in a non-class action lawsuit) for the alleged injury to nonparties "creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains." Campbell, 538 U.S. at 423.

32

These highly improper inflammatory arguments were clearly, timely, and repeatedly objected to by R.J. Reynolds' counsel. However, the trial court, which appeared focused on getting the case to the jury, as opposed to monitoring the arguments of counsel and protecting the fairness of the proceedings, either overruled R.J. Reynolds' objections or, in some instances, completely ignored them and simply **thanked** R.J. Reynolds' counsel for his objection. We, therefore, review these improper arguments under a harmless error standard of review. See Cardona v. State, 185 So. 3d 514, 520 (Fla. 2016) (providing that "[w]here the comments were improper and the defense objected, but the trial court erroneously overruled defense counsel's objection, [the appellate court] appl[ies] the harmless error standard of review"); accord Diaz v. State, 139 So. 3d 431, 434 (Fla. 3d DCA 2014).

Under the harmless error analysis, the beneficiary of the error, which in this case are the Plaintiffs, must prove that there is no reasonable possibility that the error contributed to the verdict, and if the beneficiary fails to satisfy that burden, then the error is harmful and a new trial is **required**. See Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1256 (Fla. 2014). The Plaintiffs have clearly failed to establish that the cumulative effect of this objected-to highly inflammatory argument and the other improper objected-to closing arguments was harmless in this case.

The Florida Supreme Court and this Court have repeatedly cautioned lawyers and judges alike that closing arguments "must not be used to 'inflame the minds and

33

passions of the jurors so that their verdict reflects an emotional response . . . rather than the logical analysis of the evidence in light of the applicable law." Murphy v. Int'l Robotic Sys., Inc., 766 So. 2d 1010, 1028 (Fla. 2000) (quoting Bertolotti v. State, 476 So. 2D 130, 134 (Fla. 1985)); see also Garron v. State, 528 So. 2d 353, 359 (Fla. 1988) (noting that comments in closing arguments that inject elements of emotion and fear into the jury's deliberations go "far outside the scope of proper argument"); Chin v. Caiaffa, 42 So. 3d 300, 311-12 (Fla. 3d DCA 2010) (warning that inflammatory and prejudicial comment "will not be condoned").

The courts in this state have reversed jury verdicts based on inflammatory closing arguments after performing a harmless error analysis, and they have even reversed jury verdicts after performing a fundamental error analysis, requiring a much higher burden. For example, in Walt Disney World Co. v. Blalock, 640 So. 2d 1156, 1158 (Fla. 5th DCA 1994), the Fifth District Court of Appeal concluded that the plaintiff's counsel's inflammatory comments and personal opinions during closing arguments, **even though not objected to, constituted fundamental error** and deprived Walt Disney World of its right to a fair trial. In that case, a ten year old boy was injured when he was riding as a passenger in a boat at the park and the boat bumped into the side of another passenger boat, and the boy's hand was allegedly caught between the two boats and resulted in the amputation of his thumb. The improper argument made by counsel for the plaintiff is as follows:

34

[Y]ou know, why don't you consider the fact that maybe instead of Luke, a ten year old, that we have a three or four year old sitting in this seat and they had their little ears on, okay, that they bought at the Magic Kingdom and the ears fell off into the water and so they go to pick them up. . . . The boat, it takes their arm off or if they're leaning over it smashes them in the head? . . . I mean, you know, but for the grace of God, you know, we'd have some other catastrophic circumstance . . . .

Blalock, 640 So. 2d at 1158.

In the instant case, R.J. Reynolds timely objected to the improper inflammatory arguments. Thus, unlike the defendant in Blalock, which was required to and did in fact demonstrate fundamental error, the burden is on the Plaintiffs in this case to demonstrate that the error was harmless error. As will be discussed at length under section II of this dissent, the Plaintiffs have failed to meet their burden in this case due to the cumulative effect of multiple improper closing arguments and the extremely high loss of consortium verdicts. The Plaintiffs' counsel asked the jury to award Mr. Schleider's wife $11 million for her loss of consortium claim against R.J. Reynolds, but the jury awarded her $15 million despite the very limited evidence provided by the wife regarding her loss, and the jury awarded Mr. Schleider's non-dependent daughter an additional $6 million, an amount which our sister courts have found to be excessive for a child who is not dependent on the deceased parent for support or companionship.

The majority suggests that the reversal ordered in Blalock can be distinguished from the improper arguments made by the Plaintiffs' counsel in the

35

instant case. I respectfully disagree. In both cases, the closing arguments were improper, inflammatory, and pervasive. My dissent relies on the reversal in <u>Blalock</u> because a new trial was ordered despite the vastly different and the more difficult burden that had to be met to obtain a reversal based on the improper closing arguments. In <u>Blalock</u>, defense counsel failed to object to the improper arguments made by the plaintiff's counsel. Thus, instead of the plaintiff having the burden (as it has in the instant case) to prove that the improper arguments did not contribute to the verdict, the burden was on the defendant in <u>Blalock</u>, and the defendant was required to demonstrate fundamental error. In other words, the burden shifted from the plaintiff to the defendant in <u>Blalock</u> and the burden was a much higher burden.

In the instant case, R.J. Reynolds **did** object but the trial court overruled the objections. Thus, the burden is on the Plaintiffs, not R.J. Reynolds, and the Plaintiffs must prove that **the error did not contribute to the verdict**. Also, and importantly, the verdicts in <u>Blalock</u> did not even approach the level of the awards in the instant case. The jury in <u>Blalock</u> awarded a total of $881,895 in damages, and $279,200 of that award was for future medical expenses. Here, the jury awarded Mr. Schleider's wife $15 million and his non-dependent daughter $6 million based solely on their loss of consortium claims.

In <u>State v. Jones</u>, 558 S.E.2d 97, 99 (N.C. 2002), the Supreme Court of North Carolina reversed a death sentence and remanded for a new sentencing hearing based

36

on the State's improper closing arguments before a jury during the sentencing phase of the trial. Over defense objection, the State improperly referred to the Oklahoma City federal building bombing and the Columbine school shootings in what the court concluded could not "be construed as anything but a thinly veiled attempt to appeal to the jury's emotions." Id. at 107. The court found that the argument was improper because: "(1) it referred to events and circumstances outside the record; (2) by implication, it urged jurors to compare defendant's acts with the infamous acts of others; and (3) it attempted to lead jurors away from the evidence by appealing instead to their sense of passion and prejudice." Id. at 107.

Similarly, in the instant case, the Plaintiffs' counsel's closing argument improperly referred to events and circumstances outside the record that were totally irrelevant to the amount of damages suffered by the Plaintiffs in this case: the alleged 450,000 smoking-related deaths, the alleged 8.5 million smoking-related illnesses, and the families' grief and mourning in those cases as a result of those deaths and illnesses. Rather than focusing on the evidence, these improper closing arguments appealed to the jury's sense of passion and prejudice, and instead of urging the jurors to compare R.J. Reynolds' acts with the acts of others as in Jones, the Plaintiffs' counsel attempted to impute the damages allegedly suffered by millions of people to the damages awardable in this individual case.

In evaluating whether the plaintiff's improper closing argument required a

37

new trial, the Jones court concluded that **"[t]he impact of the statements in question, which conjure up images of disaster and tragedy of epic proportion, is too grave to be easily removed from the jury's consciousness, even if the trial court had attempted to do so with instructions**," id. at 107 (emphasis added), and therefore, reversed for a new sentencing proceeding.

In Samuels v. Torres, 29 So. 3d 1193, 1197 (Fla. 5th DCA 2010), the Fifth District also reversed for a new trial based on the plaintiff's counsel's improper arguments and based on a much higher burden of proof than the one in the instant case. Because defense counsel failed to object to the improper arguments, the burden shifted, as it did in Blalock, to the defendant to establish fundamental error. The Fifth District concluded that fundamental error was established and ordered a new trial stating that "counsel for Torres [had] employed a defense stratagem in his opening statement to curry sympathy from the jury and it is obvious from this record that he succeeded," and "[a]s a result, Samuels was deprived of a fair trial." Similarly, in DeFreitas v. State, 701 So. 2d 593, 601 (Fla. 4th DCA 1997), the Fourth District found that the prosecutor violated the rule against inflammatory argument by comparing the misconduct of the defendant to the O.J. Simpson case, and held that this improper argument, along with other improper arguments, constituted **fundamental error** requiring a new trial.

In each of these cases, Blalock, Samuels, and DeFreitas, the appellate courts

concluded that the cumulative effect of the improper arguments required a new trial, and in each of these cases the burden was a much higher burden than in the instant case because in those cases, no objection was made, and thus the defendant was required to establish, and did establish, that the error rose to the level of fundamental error. In the instant case, the Plaintiffs, not the defendant, have the burden and their burden is to establish that the cumulative effect of the improper arguments was harmless. The Plaintiffs have not met that burden here based on the extremely high loss of consortium damages the jury awarded to Mr. Schleider's wife and non-dependent daughter, which reflects that Plaintiffs' counsel's stratagem—to curry sympathy from the jury—succeeded. Torres, 29 So. 3d at 1197.

Asking the jurors in the instant case to conjure up the image of three plane crashes a day for a year, the yearly deaths of 450,000 Americans, an additional 8.5 million Americans who are suffering with smoking-related illnesses, and the mourning of millions of American families, far surpasses the "tragedy of epic proportion" improperly argued in Jones. And because the trial court overruled R.J. Reynolds' objections, the trial court telegraphed to the jurors that it was entirely proper for them to consider these images and the total number of affected people when determining the damages they could and should award in this case. I would, therefore, reverse on this ground alone.

B. **Attacks upon R.J. Reynolds and its counsel for their defense of the case**

"The law is clear that it is improper for an attorney to disparage an opposing party's defense of a case or to suggest that a party should be punished for contesting a claim." Fasani v. Kowalski, 43 So. 3d 805, 809 (Fla. 3d DCA 2010). In fact, "[t]he most grievous arguments" a plaintiff's lawyer can make are those suggesting that the defendant "acted improperly by defending [against the plaintiff's] claims." Carnival Corp. v. Pajares, 972 So. 2d 973, 977 (Fla. 3d DCA 2007).

In the instant case, the Plaintiffs' counsel attacked R.J. Reynolds for pursuing a comparative fault defense by claiming that R.J. Reynolds' defense was an improper attack on "the victim" in an effort to blame "the victim" for the damages he suffered, even though Mr. Schleider's wife admitted on the stand that her husband bore some responsibility for his injuries because he did not try hard enough to quit smoking. The Plaintiffs' counsel also disparaged R.J. Reynolds' counsel and suggested that they were participants in the tobacco industry's conspiracy.

> [Plaintiffs' Counsel]: You know, it's funny that they get up here and they….
>
>     . . . .
>
> [Plaintiffs' Counsel]: She just got up here and she showed you all the scientists who did all this research, the 6,000 studies, and it's amazing that they are still proud of it, that they are still bragging about all the research that all this money paid for when the judge is going to instruct you that the Engle trial, the CTR, funded that research and they were found liable for the fraud. So they still haven't - -
>
> [Defense Counsel]: Objection, misstating the instruction, your Honor.

40

[Plaintiffs' Counsel]: Well, [the trial court] will read the instruction to you.

[The Court]: Okay, I already read that in jury instructions. Continue to finish up your closing.

[Plaintiffs' Counsel]: You heard from Dr. Proctor about that research, what the dirty money was used for, how people didn't know what it was being used for, the CTR, the TIRC, they were all in it together, they were all part of the fraud. So the fact that they're still, still, to this day, trying to pretend like they - -

[Defense Counsel]: Objection, to characterizing our defense of the case, Your Honor.

[Plaintiffs' Counsel]: Okay, I'll move on.

[Defense Counsel]: Motion - -

[The Court]: Move on, Mr. Paige [Plaintiffs' counsel].

This Court has repeatedly reversed judgments and remanded for new trials based on arguments that denigrated the defense of a case or suggested that the defendant had done something wrong by not admitting responsibility, presenting a defense, or arguing comparative fault by the plaintiff. For example, in Pajares, this Court reversed and remanded for a new trial based on plaintiff's counsel's improper closing arguments, which included attacks upon Carnival for presenting evidence that Pajares smoked, and asking the jury to consider Pajares's smoking when determining his comparative negligence, and suggesting that Carnival should be punished for defending the claims against it and for failing to accept its responsibility and the harm it had caused Pajares. Pajares, 972 So. 2d at 977-78.

41

This Court has also held that plaintiff's counsel's improper, inflammatory remarks and personal attacks upon defense counsel required a new trial in Sanchez v. Nerys, 954 So. 2d 630, 632 (Fla. 3d DCA 2007); State Farm Mut. Auto Ins. Co. v. Revuelta, 901 So. 2d 377, 379-80 (Fla. 3d DCA 2005) (reversing a judgment in favor of Revuelta where Revuelta's counsel insinuated that State Farm had acted in bad faith by defending the action, rather than simply paying the benefits); Carnival Cruise Lines, Inc. v. Rosania, 546 So. 2d 736, 737-38 (Fla. 3d DCA 1989) (reversing the judgment entered in favor of the plaintiffs and remanding for a new trial due to comments made by the plaintiffs' counsel disparaging the manner in which Carnival defended the action).

This Court has not been alone in its conclusion that such objected-to arguments are not harmless and require a new trial. See R.J. Reynolds Tobacco Co. v. Odom, 210 So. 3d 696, 701-02 (Fla. 4th DCA 2016) ("In the tobacco context, we have held that if preserved, comments disparaging a tobacco company for failing to take responsibility warrant a new trial."); Cohen v. Philip Morris U.S.A., Inc., 203 So. 3d 942, 948 (Fla. 4th DCA 2016) (finding that the trial court did not abuse its discretion by granting a new trial based on objected-to closing comments by plaintiff's counsel concerning the tobacco company's failure to take responsibility); R.J. Reynolds Tobacco Co. v. Calloway, 201 So. 3d 753, 759 (Fla. 4th DCA 2016) (finding that tobacco defendants' preserved objections to plaintiff's counsel's

42

improper comment as to tobacco companies' "alleged failure to accept responsibility" mandated reversal); <u>Allstate Ins. Co. v. Marotta</u>, 125 So. 3d 956, 960-61 (Fla. 4th DCA 2013) (reversing and remanding for a new trial where insured's counsel improperly urged the jury to punish Allstate for defending against its insured's claim); <u>Intramed, Inc. v. Guider</u>, 93 So. 3d 503, 506-07 (Fla. 4th DCA 2012) (reversing for a new trial based on plaintiff's counsel's arguments suggesting that Intramed should be punished for failing to take responsibility, for failing to apologize, and for defending the case).

In <u>Calloway</u>, the Fourth District Court of Appeal, sitting en banc, concluded that the tobacco company defendants were entitled to a new trial based on plaintiff's counsel's improper inflammatory closing arguments. <u>Calloway</u>, 201 So. 3d at 758-59. The inflammatory arguments made by plaintiff's counsel in that case centered around the tobacco companies' failure to take responsibility for their actions, plaintiff's counsel's suggestion that the tobacco companies should be punished for contesting damages at trial, and arguing that the tobacco companies' defense of their actions in court was improper. <u>Id.</u> at 759-61. The Fourth District noted that it had previously found such arguments to be improper in <u>Marotta</u>, <u>Guider</u>, and <u>Philip Morris USA, Inc. v. Tullo</u>, 121 So. 3d 595, 598 (Fla. 4th DCA 2013). In <u>Marotta</u> and <u>Guider</u>, the Fourth District reversed and remanded for a new trial because the objections to these arguments were preserved; however, it affirmed the judgment in

<u>Tullo</u> because the tobacco companies failed to object and the comments did not constitute fundamental error under the four-part test established by the Florida Supreme Court in <u>Murphy</u>. <u>Calloway</u>, 201 So. 3d at 760. The Fourth District also found in <u>Calloway</u>, that, even though the trial court had sustained many of the tobacco companies' objections to these arguments and in some instances gave a curative instruction, the trial court failed to adequately perform its duty to control the behavior of plaintiff's counsel and that the cumulative effect of the repeated improprieties and sustained objections unduly prejudiced the jurors. <u>Id.</u> at 763-65.

In the instant case, the Plaintiffs' counsel's improper arguments were exacerbated by the trial court's failure to sustain R.J. Reynolds' objections, thus encouraging, rather than admonishing, the Plaintiffs' counsel to continue to make such arguments and telegraphing to the jury that these improper arguments should be considered in reaching its verdict. If sustaining the objections and giving curative instructions was insufficient to erase the taint of similar improper arguments in <u>Calloway</u>, then clearly overruling and ignoring R.J. Reynolds' objections in the instant case require a new trial.

We should also reject, as the Fourth District Court of Appeal has rejected, the assertion that such arguments are permissible because in addition to determining the proper amount of compensation, the jury was asked to determine whether punitive damages was warranted. <u>See Cohen</u>, 203 So. 3d at 942 (rejecting the argument that

even if such arguments could be considered relevant to the issue of punitive damages, the arguments may have tainted the jury's compensatory liability determination). And, as will be discussed later in this dissent, the Plaintiffs have failed to prove that there is no reasonable possibility that the trial court's incorrect overruling of R.J. Reynolds' objections to the improper arguments by the Plaintiffs' counsel (suggesting that R.J. Reynolds should be punished for defending the case, failing to take responsibility, and for blaming Mr. Schleider for continuing to smoke after he became aware of the danger to his health) did not contribute to the verdict.

Based on Pajares, Sanchez, Fasani, Revuelta, Rosania, Cohen, Odom, Calloway, Marotta, and Guider, the Plaintiffs' counsel's arguments disparaging R.J. Reynolds' defense of the Plaintiffs' claims and suggesting that R.J. Reynolds was acting in bad faith for pursuing a comparative negligence defense based on Mr. Schleider's continued smoking after learning about its harmful effects was improper. The trial court erred by overruling R.J. Reynolds' objections to these improper arguments and, as will be discussed later in this dissent, these arguments, coupled with the improper inflammatory arguments and other improper arguments, deprived R.J. Reynolds of its right to a fair trial, requiring a reversal for a new trial.

## C. **Comparing R.J. Reynolds' "wealth" and "power" to that of Mr. Schleider**

The courts in this state have long recognized that "jurors have a tendency to favor the poor as against the rich and, if provoked by such inflammatory evidence,

45

the jury is likely to apply the deep pocket theory of liability." Sossa ex rel. Sossa v. Newman, 647 So. 2d 1018, 1019-20 (Fla. 4th DCA 1994); see also Revuelta, 901 So. 2d at 380 (recognizing that jurors may be influenced by evidence of a party's wealth).

Plaintiffs' counsel, however, highlighted R.J. Reynolds' and the tobacco industry's wealth and power in his closing arguments and asked the jury to compare that power and wealth to Mr. Schleider who was just a "a gentleman who was addicted to nicotine who tried as hard as he could to stop."

> [Plaintiffs' Counsel]: And I just want to be clear, we're talking about a gentleman who was addicted to nicotine who tried as hard as he could to stop, and we ask you to compare that to the actions of these corporations. You know, it's not just R.J. Reynolds, it's Brown & Williamson, American Tobacco, **all their power, all their money**.

R.J. Reynolds' counsel immediately objected and requested to approach the bench to make a motion. At the sidebar conference, R.J. Reynolds' counsel articulated his objections and moved for a mistrial. R.J. Reynolds argued that Plaintiffs' counsel's argument was in violation of R.J. Reynolds' pre-trial motion in limine, which was granted by the trial court, precluding the Plaintiffs' counsel from commenting on the wealth, resources, or financial being of the company, and specifically noted that the argument was directed to and made in the context of comparative fault. The trial court overruled the objection and told Plaintiffs' counsel to rephrase the argument and to move on.

Plaintiffs' counsel's argument was clearly improper. The trial court erred by

denying R.J. Reynolds' objection, and the cumulative effect of the Plaintiffs' counsel's improper arguments and the trial court's overruling of each and every one of R.J. Reynolds' timely objections requires a new trial. The majority opinion has not addressed this argument and has not considered its effect when combined with the highly improper arguments already discussed in this dissent.

**II. The Plaintiffs Did Not Establish That These Errors Were Harmless. Thus, a New Trial is Required**

The trial court erred when it overruled and, in some cases, ignored, R.J. Reynolds' objections thereby improperly permitting Plaintiffs' counsel to: (1) make inflammatory arguments meant to appeal to the sympathy of the jurors and to evoke an emotional response from them; (2) encourage the jury to punish R.J. Reynolds for damages suffered by non-parties to the litigation; (3) attack R.J. Reynolds and its counsel for their defense of the case and arguments regarding Mr. Schleider's comparative fault; and (4) ask the jurors to compare R.J. Reynolds' and the tobacco industry's wealth and power to that of Mr. Schleider. Because R.J. Reynolds timely objected, and its objections were overruled, the harmless error standard of review applies. Cardona v. State, 185 So. 3d 514, 520 (Fla. 2016); Diaz v. State, 139 So. 3d 431, 434 (Fla. 3d DCA 2014).

Because the Plaintiffs were the beneficiary of these errors, the Plaintiffs must establish that there is **no reasonable possibility that their counsel's improper arguments contributed to the jury's $21 million non-economic loss of**

**consortium damages verdict**.  See Special, 160 So. 3d at 1256.  The Plaintiffs clearly have not met that burden, and thus, a new trial is mandated.

The strongest indicator that the jury was influenced by the Plaintiffs' counsel's improper arguments is the extremely high non-economic damages awarded by the jury to Mr. Schleider's wife ($15 million) and Mr. Schleider's non-dependent daughter ($6 million).  The $15 million award to Mr. Schleider's wife is **$4.2 million more than the highest non-economic damages award ever affirmed in a Florida wrongful death case involving the death of a spouse**, and was $4 million more than what the Plaintiffs' counsel asked the jury to award Mrs. Schleider.  Further, the $6 million award for Mr. Schleider's non-dependent daughter far exceeds compensatory awards to children who are not living with their deceased parent and who are financially independent.

A. **The $15 million loss of consortium award to Mr. Schleider's wife**

The Plaintiffs have not been able to identify a single affirmed non-economic award to a surviving spouse close to the $15 million award to Mr. Schleider's wife. The record does not establish any unique facts or circumstances in this case which could possibly justify such a high award to Mrs. Schleider.  The record reflects that Mr. and Mrs. Schleider married in 1966; on December 13, 1996, Mr. Schleider was diagnosed with having a metastasized small-cell cancer in his liver which had probably originated in his lung; and six months after being diagnosed, Mr. Schleider

48

died. The record also reflects that in 1978 or 1979, while working as a carpenter, Mr. Schleider fell from a roof, suffered debilitating fractures in both heels, and injured his back, which resulted in a declaration that he was permanently disabled. Thereafter, Mrs. Schleider supported the family while Mr. Schleider stayed home and cared for their children.

Although it is clear that Mr. Schleider did an excellent job performing the many tasks as a stay-at-home parent and was a loving husband and father, there is very little evidence as to the pain and suffering he experienced following his diagnosis and his death six months later. Further, there was little evidence as to the emotional or physical pain Mrs. Schleider experienced during that six-month period associated with her husband's illness. In fact, the record reflects that prior to the diagnosis in 1996, Mr. Schleider demonstrated no symptoms other than periodic fatigue and that the only pain he was experiencing was the daily chronic pain due to his disabling prior injuries. Further, the record does not reflect how involved Mrs. Schleider was in her husband's care or what that care involved. Mrs. Schleider testified that hospice came to the house each day to assist with her husband's care, and that she did not accompany her husband for his doctors' appointments. Additionally, the only post-death evidence regarding Mrs. Schleider's life since her husband's death in 1997 is that she has never remarried, she still lives in the Florida Keys, she misses her husband, and she has travelled extensively around the world

with her friends.

This absence of evidence is important because spousal awards that were much smaller than the $15 million award to Mrs. Schleider, but which the appellate courts considered had reached the upper limit of a permissible award, were affirmed based upon record evidence that demonstrated extraordinary suffering by the surviving spouse. For example, in Philip Morris USA Inc. v. Cohen, 102 So. 3d 11, 19 (Fla. 4th DCA 2012),[8] the Fourth District Court of Appeal found that, although the $10 million compensatory damage award to Cohen's surviving spouse **was at the outer limit of reasonableness** for such a case, the record established an evidentiary basis to justify the award. Specifically, the jury heard testimony about what the couple's life was like after Nathan's diagnosis. The jury also learned that Nathan's wife tore both of her rotator cuffs while caring for Nathan and, although her injuries were very painful and required surgery, Nathan's wife testified that the emotional injury she suffered during that time was worse than the physical pain she had endured. Cohen, 102 So. 3d at 19.

The Fourth District noted that the evidence in Cohen regarding Nathan's

---

[8] This case should not be confused with Cohen v. Philip Morris USA, Inc., 203 So. 3d 942 (Fla. 4th DCA 2016), which has been cited to earlier in this dissent and which was reversed based on improper closing arguments made by counsel for the plaintiff. In Cohen v. Philip Morris, the smoker was Helen Cohen. In Philip Morris v. Cohen, the smoker was Nathan Cohen. The two cases are unrelated, involved different plaintiffs, and the issues on appeal were completely different.

spouse's pain and suffering was nearly identical to the evidence relied upon by the First District in R.J. Reynolds Tobacco Co. v. Townsend, 90 So. 3d 307 (Fla. 1st DCA 2012). Cohen, 102 So. 3d at 19. In Townsend, a divided panel affirmed a $10.8 million compensatory damage award to the surviving spouse even though it was the highest non-economic damage award affirmed for such damages in an Engle-progeny case. The majority concluded that the record established an evidentiary basis for the high award. Townsend, 90 So. 3d at 311-12. Mrs. Townsend testified that she and her husband enjoyed a very close relationship during their 39-year marriage and they were always together until her husband became ill. Id. at 312. When he became ill, Mrs. Townsend was forced to remain in Ocala to work to support the couple while Mr. Townsend received treatment and underwent surgery related to his lung cancer in Chicago. Id. at 312. Mrs. Townsend also described her husband's suffering, how she cared for him as he lay dying during the final six months of his life, and the acute impact this had and will continue to have on her for the rest of her life. Id.

The panel in Townsend was, however, divided on the reasonableness of the award. In his dissent, Judge Wetherell recognized that an award should only be disturbed if it is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate" but he concluded that this standard was met in Townsend with its $10.8 million award to Mrs.

51

Townsend. Id. at 316-17 (Wetherell, J., dissenting in part) (internal citations omitted). Judge Wetherell noted that the cases cited to by the plaintiff "in an attempt to justify the excessive compensatory damage award in this case involved awards to parents for the death of a child, which is a far more traumatic loss than the loss of a spouse to lung cancer after a lifetime of smoking." Id. at 317 (footnote omitted). Judge Wetherell also stated that in Citrus County v. McQuillin, 840 So. 2d 343, 347 (Fla. 5th DCA 2003), the "Fifth District made a point of noting that the $4.4 million non-economic damage award in that case (for a 7-year-old child who lost his mother in a 'horrific' car accident) was 'on the outer limit in size.'" Townsend, 90 So. 3d at 317. Judge Wetherell was also convinced that the jury's verdict was the product of passion and prejudice based on the improper and inflammatory arguments made by counsel for the plaintiff, but which were not preserved by objection or raised on appeal, and posited that non-economic compensatory damages to a surviving spouse similar to this case should be no higher than $5 million. Id. at 319.

Based on the affirmances of $10 million and $10.8 million compensatory spousal damage awards in Cohen and Townsend, respectively, this Court affirmed a $10 million compensatory spousal award in Lorillard Tobacco Co. v. Alexander, 123 So. 3d 67 (Fla. 3d DCA 2013). Alexander is distinguishable because, unlike the instant case, in Alexander there were no improper closing arguments and Mrs. Alexander described her pain and suffering as she "nursed, cared for, and watched

52

the love of her life become incontinent and unable to move or breathe." Alexander, 123 So. 3d at 78.

The extremely high non-economic damages awards in these three cases are clearly not the norm as reflected by the following non-exclusive list of recent verdicts involving spousal awards for compensatory damages.

- Philip Morris USA Inc. v. Gore, No. 4D15-3892, 2018 WL 859058 (Fla. 4th DCA Feb. 14, 2014)—**$2 million**.
- Philip Morris USA Inc. v. Boatright, 217 So. 3d 166 (Fla. 2d DCA 2017)—**$2.5 million**.
- Philip Morris USA Inc. v. Barbose, 228 So. 3d 702 (Fla. 2d DCA 2017)—**$10 million to estate consisting of wife and two children**.
- Philip Morris USA Inc. v. Marchese, 231 So. 3d 473 (Fla. 4th DCA 2017)—**$1 million**.
- Gentile, Estate of v. Philip Morris USA Inc., 2017 WL 7518447 (Fla. 15th Cir. Ct., Oct. 10, 2017)—**$7 million to estate consisting of spouse and adult children**.
- Sommers v. Philip Morris USA Inc., 2017 WL 3783048 (Fla. 11th Cir. Ct., June 17, 2017)—**$1 million**.
- Whitmire v. R.J. Reynolds Tobacco Co., 2017 WL 5006528 (Fla. 2d Cir. Ct., March 28, 2017) **$3 million to estate consisting of spouse and one adult son**.
- R.J. Reynolds Tobacco Co. v. Robinson, 216 So. 3d 674 (Fla. 1st DCA 2017)—**$16 million to estate consisting of spouse and son but reversed due to improper closing arguments**.
- Lawrence v. R.J. Reynolds Tobacco Co., 2017 WL 4416433 (Fla. 5th Cir. Ct., May 9, 2017)—**$250,000**.
- Brown v. Phillip Morris, 2017 WL 2264504 (Fla. 6th Cir. Ct., March 1, 2017)—**$1.8 million**.
- Lima v. R.J. Reynolds Tobacco Co., 2017 WL 2306252 (Fla. 13th Cir. Ct., April 20, 2017)—**$3 million to estate consisting of spouse and four adult children**.
- Philip Morris USA, Inc. v. Pollari, 228 So. 3d 115 (Fla. 4th DCA 2017)—**$3 million but reversed due to improper introduction of evidence by plaintiff**.

53

- R.J. Reynolds Tobacco Co. v. Grossman, 211 So. 3d 221 (Fla. 4th DCA 2017)—**$3.5 million**.
- R.J. Reynolds Tobacco Co. v. Wilcox, 197 So. 3d 52 (Fla. 3d DCA 2016)—**$7 million**.
- Ledo v. R.J. Reynolds Tobacco Co., 2016 WL 8467771 (Fla. 11th Cir. Ct., Nov. 2, 2016)—**$6 million to estate consisting of spouse and one adult son**.
- Johnston v. R.J. Reynolds Tobacco Co., 2016 WL 8116092 (Fla. 12th Cir. Ct., Nov. 2, 2016)—**$7.5 million**.
- Price v. R.J. Reynolds Tobacco Co., 2016 WL 6157876 (Fla. 4th Cir. Ct. Sept. 28, 2016)—**$6.4 million**.
- Konzelman v. R.J. Reynolds Tobacco Co., 2016 WL 7337376 (Fla. 11th Cir. Ct. Oct. 24, 2016)—**$8.5 million**.
- Cohen v. Phillip Morris USA, Inc., 203 So. 3d 942 (Fla. 4th DCA 2016)—**$2,055,050 million—but reversed based on improper closing arguments**.
- R.J. Reynolds Tobacco Co. v. Williams, 183 So. 3d 408 (Fla. 3d DCA 2016)—**$5 million**.
- Varner v. R.J. Reynolds, 2016 WL 6839474 (Fla. 17th Cir. Ct. July 19, 2016)—**$1.5 million**.
- McCabe v. R.J. Reynolds Tobacco Co., 2016 WL 5375150 (Fla. 13th Cir. Ct. May 19, 2016)—**$5 million for spouse and four children**.
- Nally v. R.J. Reynolds Tobacco Co., 2016 WL 6839473 (Fla. 10th Cir. Ct. May 17, 2016)—**$6 million**.
- R.J. Reynolds Tobacco Co. v. Gafney, 188 So. 3d 53 (Fla. 4th DCA 2016)—**$5.8 million but reversed based on improper closing argument**.
- Soffer v. R.J. Reynolds Tobacco Co., 187 So. 3d 1219 (Fla. 2016)—**$2 million.**
- McCoy v. R.J. Reynolds Tobacco Co., 2015 WL 12844640 (Fla. 17th Cir. Ct. July 13, 2015)—**$1.5 million for spouse and eight children**.
- R.J. Reynolds Tobacco Co. v. Schoeff, 178 So. 3d 487 (Fla. 4th DCA 2015)—**$10 million**.
- Hardin v. R.J. Reynolds Tobacco Co., 2015 WL 10015108 (Fla. 11th Cir. Ct. June 18, 2015)—**$776,000**.
- R.J. Reynolds Tobacco Co. v. Ward, 141 So. 3d 236 (Fla. 1st DCA 2014)—**$487,000**.
- Clayton v. R.J. Reynolds Tobacco Co., 2014 WL 8764384 (Fla. 4th Cir. Ct. March 17, 2014)—**$550,000**.

- Bowden v. R.J. Reynolds Tobacco Co., 2014 WL 8764383 (Fla. 4th Cir. Ct. March 26, 2014—**$5 million**.
- Johnson v. R.J. Reynolds Tobacco Co., 2014 WL 3810357 Fla. Cir. 1st Ct. July 21, 2014)—**$7.3 million for spouse and one child**.
- R.J. Reynolds Tobacco Co. v. Ciccone, 190 So. 3d 1028 (Fla. 2016)—**$3 million**.
- Philip Morris USA, Inc. v. Tullo, 121 So. 3d 595 (Fla. 4th DCA 2013)—**$4.5 million**.
- Loyd v. R.J. Reynolds Tobacco Co., 2013 WL 12110278 (Fla. 13th Cir. Ct. Feb. 11, 2013)—**$3.120 million for spouse and three children**.
- Philip Morris USA, Inc. v. Allen, 116 So. 3d 467 (Fla. 1st DCA 2013)—**$3 million**.
- R.J. Reynolds Tobacco Co. v. Buonomo, 138 So. 3d 1049 (Fla. 4th DCA 2013)—**$4.83 million**.
- Skolnick v. R.J. Reynolds Tobacco Co., 2013 WL 6001152 (Fla. 15th Cir. Ct. June 19, 2013)—**$2.5 million**.
- Sikes v. R.J. Reynolds Tobacco Co., 2012 WL 10702742 (Fla. 4th Cir. Ct. Sept. 20, 2012)—**$2,165,722 million**.
- R.J. Reynolds Tobacco Co. v. Martin, 53 So. 3d 1060 (Fla. 1st DCA 2011)—**$5 million**.
- Mack v. R.J. Reynolds, 2011 WL 1562171 (Fla. 8th Cir. Ct. March 18, 2011)—**$1 million**.
- R.J. Reynolds Tobacco Co. v. Brown, 70 So. 3d 707 (Fla. 4th DCA 2011)—**$1.2 million**. **Wife passed away before case proceeded to trial, $1,000,000 awarded to estate (two sons).**

All of the cases cited above were tobacco cases, most included R.J. Reynolds as a defendant, and similar evidence was presented. The only things "unique" about the instant case are that, despite the jury's finding that punitive damages were not appropriate in this case, the jury awarded Mr. Schleider's wife $15 million for her loss of consortium claim, which was $4 million more than the $11 million Plaintiffs' counsel asked the jury to award and is the highest award to a surviving spouse, and the lack of evidence to support such a large loss of consortium spousal award. The

substantially higher jury award to Mr. Schleider's wife, when compared with the awards to surviving spouses for non-economic damages in similar tobacco wrongful death cases demonstrate that the improper objected-to closing arguments made by Plaintiffs' counsel in the instant case is not harmless error—that there is no reasonable possibility that the improper arguments contributed to the jury's verdict.

## B. The $6 million non-economic damages award to Mr. Schleider's non-dependent daughter

Under Florida's wrongful death statute, "[m]inor children of the decedent, and all children of the decedent if there is no surviving spouse, may . . . recover for lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury." § 768.21(3), Fla. Stat. (2014). Section 768.18(2) defines a minor child as a child under twenty-five years of age. Thus, although Mr. Schleider was survived by his wife, his daughter, who was twenty-two years old at the time of her father's death, qualifies as a minor for purposes of the wrongful death statute, and therefore, may seek an award of non-economic (loss of consortium) damages.

However, "[u]nder Florida law an award of non-economic damages must bear a reasonable relation to the philosophy and general trend of prior decisions in such cases." Cohen, 102 So. 3d at 18 (quoting Bravo v. United States, 532 F.3d 1154, 1162 (11th Cir. 2008)). The jury awarded Mr. Schleider's daughter, who was twenty-two years old and not living with her parents or financially dependent on them when Mr. Schleider died, $6 million. Although the issue addressed in this

dissent is the effect of the Plaintiffs' counsel's improper arguments on the jury, and relies on the extremely high verdicts as evidence that the error was not harmless, we note that our sister courts have found that awards which were in the range awarded Mr. Schleider's daughter, were excessive. For example, in R.J. Reynolds Tobacco Co. v. Webb, 93 So. 3d 331, 338 (Fla. 1st DCA 2012), the First District Court of Appeal reversed a $7.2 million non-economic damage award to an adult daughter as excessive after failing to uncover a single case in which an adult child had received a wrongful death award of that magnitude that had been affirmed on appeal and finding that the record did not support such an award because Mr. Webb's daughter was not dependent on her father's companionship, instruction, and guidance when he died. Id. at 339.

The Fourth District Court of Appeal also reversed the $5 million non-economic damages award to Mrs. Putney's non-dependent children in Philip Morris USA Inc. v. Putney, 199 So. 3d 465 (Fla. 4th DCA 2016). The Fourth District concluded that although Mrs. Putney's children were entitled to a consortium award, $5 million was excessive when compared with similar cases and where none of the children lived with or relied on Mrs. Putney for support. Putney, 199 So. 3d at 471; see also MBL Life Assur. Corp. v. Suarez, 768 So. 2d 1129, 1136 (Fla. 3d DCA 2000) (reversing as excessive the jury's $1 million non-economic damages awards to each of the four children who were not residing with or financially dependent

upon their deceased father for support).

Although in these cases the issue was whether the loss of consortium awards to the decedent's children were excessive and thus requiring the issuance of a remittitur, not whether the defendant was entitled to a new trial altogether due to the plaintiff's counsel's improper arguments, they highlight and support the conclusion that the Plaintiffs' counsel's improper arguments in this case were not harmless, as the jury awarded Mr. Schleider's non-dependent daughter $6 million, an amount other courts have found to be excessive.

## C. The trial court's failure to sustain R.J. Reynolds' objections is not harmless error

As previously stated, the Plaintiffs have the burden to prove that their counsel's highly inflammatory and other improper arguments to the jury did not contribute to the verdict. Special, 160 So. 3d at 1256; see also Calloway, 201 So. 3d at 761. In other words, the Plaintiffs must demonstrate that "there is no reasonable possibility that the error contributed to the verdict." Id.

After a review of the evidence presented in this case, which included that Mr. Schleider's pain and suffering extended over no more than a six-month period, and a review of the loss of consortium verdicts sustained in similar tobacco-related cases, it is impossible to conclude that there is no reasonable possibility that the cumulative effect of the Plaintiffs' counsel's highly inflammatory and highly improper arguments did not contribute to the loss of consortium awards to Mr. Schleider's

wife and non-dependent daughter. The appellate courts of this state have reversed and remanded for a new trial even where the improper arguments were less offensive than the arguments made in this case.

In R.J. Reynolds Tobacco Co. v. Robinson, 216 So. 3d 674, 683 (Fla. 4th DCA 2017), the Fourth District Court of Appeal concluded that plaintiff's counsel's improper arguments and comments "clearly intended to stir the passions of the jury," and based on the high verdict awards, it was clear that counsel's "misconduct had its intended effect." See also Harbor Ins. Co. v. Miller, 487 So. 2d 46, 47 (Fla. 3d DCA 1986) (finding that the excessiveness of the award was evidence that the prejudicial conduct complained of by the appellant influenced the trial); Christopher v. Fla., 449 F.3d 1360, 1374 n.11 (11th Cir. 2006) (concluding that "the jury's award of excessive damages [was] proof that Plaintiff's counsel's misconduct probably influenced the jury").

A new trial is required in the instant case because the Plaintiffs' counsel's improper closing arguments went unchecked and were enforced and aggravated by the trial court, which either overruled R.J. Reynolds' objections, merely thanked R.J. Reynolds after R.J. Reynolds objected, asked Plaintiffs' counsel to rephrase or move on, and denied R.J. Reynolds' numerous requests for a side bar. As the Fourth District stated in Calloway, "the trial court's duty was clear—to respond to such behavior by curbing multiple instances of improper argument and ensuring that the

jury was not being led astray by repeated objectionable comments." Calloway, 201 So. 3d at 763. "This is especially true in lengthy, high-stakes cases where a trial court's failure to control the litigants not only deprives the parties of a fair trial, but can ultimately result in scarce judicial resources being consumed when the case is remanded for re-trial based on those actions." Id.

To reiterate, the cumulative effect of the following objected-to arguments made by the Plaintiffs' counsel requires a new trial because the Plaintiff has failed to demonstrate that there is no reasonable possibility that they did not contribute to the extremely high consortium verdicts in this case: (1) the highly inflammatory arguments, wherein Plaintiffs' counsel asked the jurors to picture watching an airplane crash on CNN and focus on how bad they would feel for the families of the dead, how they would "mourn" with the families, and how "horrible" it would be, and then to multiply that horror by three plane crashes a day for a year, which would result in the deaths of 450,000 Americans; (2) Plaintiffs' counsel's attacks upon R.J. Reynolds and its counsel for defending the case and presenting evidence of Mr. Schleider's comparative fault; and (3) Plaintiffs' counsel's arguments comparing R.J. Reynolds' "power and wealth" to that of Mr. Schleider. To find that these multiple improper arguments are harmless error, "encourages 'Rambo' litigators, intent on engaging in no-holds-barred tactics at trial, to roll the dice in the appellate courts." Calloway, 201 So. 3d at 764. Asking the jury to picture watching television

60

reporting of a plane crash and to envision the mourning families and their "horrible loss" and then to multiply that vivid image and loss by three plane crashes a day for a year in order to grasp the sheer magnitude of the harm caused by R.J. Reynolds, can never be harmless error. Moreover, the extremely high verdicts in this case demonstrate that the trial court's error by not sustaining R.J. Reynolds' repeated objections and allowing the jury to consider the Plaintiffs' counsel's improper arguments had a highly prejudicial effect on the jury.

### III. The Denial of R.J. Reynolds' Motion For Remittitur

The remittitur analysis differs from the analysis performed when evaluating whether to grant a new trial based on improper closing arguments. When a party moves for a new trial based on improper arguments made by opposing counsel, the opposing party has the burden of demonstrating that there is no reasonable possibility that the improper arguments did not contribute to the verdict. This is a very high burden, and a burden that was clearly not met in this case. On the other hand, section 768.74, Florida Statutes (2014), requires a completely different analysis. Section 768.74 sets forth a list of factors a trial court is required to consider when determining whether an award is excessive or inadequate. A trial court's ruling on a motion for remittitur is reviewed for an abuse of discretion. Engle v. Liggett Grp., Inc., 945 So. 2d 1246, 1263 (Fla. 2006).

The majority has provided the factors listed in section 768.74, so they will not

be repeated here. Importantly, the effect of highly inflammatory and other improper arguments upon the trier of fact is not among those factors because, when it cannot be said that there is no reasonable possibility that the improper argument did not contribute to the verdict, the law holds that the right to a fair trial was denied and a new trial, not a reduction of the damages, is mandated.

Although a good case can be made here to support a finding that the trial court abused its discretion by failing to apply a remittitur to the loss of consortium awards, such an analysis is unnecessary based on my position that a new trial is mandated because the Plaintiffs have failed to demonstrate that their counsel's highly inflammatory and improper arguments did not contribute to the verdict.

## Conclusion

In many cases preceding this one, the appellate courts in this state have warned against the use of inflammatory arguments designed to invoke the jury's sympathy and/or anger, attacks upon the defendant or defense counsel for defending the case, and comparing the wealth and power of the defendant with that of the plaintiff. The appellate courts have reversed verdicts where these warnings have gone unheeded and where the plaintiff has not proven that there was no reasonable possibility that counsel's improper arguments did not contribute to the jury's verdict. Here, the Plaintiffs have not met that burden. R.J. Reynolds timely and repeatedly objected, but the trial court either overruled the objections or simply told Plaintiffs' counsel

62

to move on, thereby permitting the jury to consider these highly prejudicial arguments in reaching its verdicts, which are abnormally high under both a historical and a record analysis.

If appellate court warnings are to have any meaningful effect and if fairness and confidence in the judicial system are to be preserved, this case must be reversed for a new trial free of such error.

Accordingly, I respectfully dissent.